[Cite as *Dana Partners, L.L.C. v. Koivisto Constructors & Erectors, Inc.*, 2012-Ohio-6294.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| DANA PARTNERS, LLC, | : | **O P I N I O N** |
| Plaintiff-Appellee/ Cross-Appellant, | : | |
| | : | **CASE NO. 2011-T-0029** |
| - vs - | : | |
| KOIVISTO CONSTRUCTORS & ERECTORS, INC., et al., | : | |
| Defendants-Appellants/ Cross-Appellees. | : | |

Civil Appeal from the Trumbull County Court of Common Pleas, Case No. 2009 CV 03127.

Judgment: Modified and affirmed as modified.

*William L. Hawley* and *Matthew G. Vansuch*, Harrington, Hoppe & Mitchell, Ltd., 108 Main Avenue, S.W., Suite 500, P.O. Box 1510, Warren, OH 44482-1510. (For Plaintiff-Appellee/Cross-Appellant).

*Robert F. Burkey*, Burkey, Burkey & Scher Co., L.P.A., 200 Chestnut Avenue, N.E., Warren, OH 44483-5805 (For Defendants-Appellants/Cross-Appellees).

THOMAS R. WRIGHT, J.

{¶1} This case involves both an appeal and cross-appeal from a final order of the Trumbull County Court of Common Pleas. In the appeal, appellants/cross-appellees, Rudolph F. Koivisto and his two construction companies, contest the merits of the trial court's decision entering judgment against the two construction companies,

but not Koivisto personally, on appellee/cross-appellant, Dana Partners, L.L.C.'s "contract" claim. In the cross-appeal, Dana Partners contest the trial court's separate ruling that, even though Koivisto's companies are liable for the sum of $137,115.83, Koivisto himself is not personally liable because there is no showing that he engaged in fraudulent behavior.

{¶2} Dana Partners is an Ohio business entity with its principal place of operations in Warren, Ohio. The managing partner of the entity is Richard Thompson, who also owns, or has an interest in, other local businesses that engage in some form of manufacturing. As part of its business interests, Dana Partners owns a building located on Dana Street in the City of Warren. This building contains facilities for four separate manufacturing companies.

{¶3} In early 2007, a serious problem developed with the roof of the building in question. Acting on behalf of Dana Partners, Richard Thompson contacted a consulting engineer, Kurt Sauer, and Rudolph Koivisto. At that time, Koivisto was the sole owner of Koivisto Constructors and Erectors, Inc., an Ohio corporation, existing since 1994.

{¶4} After temporary repairs had been finished, Thompson decided to replace all three sections of the roof. Upon consulting with Engineer Sauer, Thompson chose to hire two companies to perform the work. The first company was Connell, Inc., a roofing contractor. Connell was primarily responsible for the actual removal of the old roof and the installation of the new roof.

{¶5} Thompson also hired Koivisto and his corporation to perform two general functions at the work site. First, Koivisto contracted to act as construction manager over the entire project. Under this aspect of their agreement, Dana Partners was required to

2

pay Koivisto the sum of $1,500 per week.  Second, Koivisto's company was to provide "plan protection" regarding the various equipment and facilities inside the building.  The essential purpose of the "plan protection" services was to enable the four manufacturing companies to continue to use the building while the new roof was installed.  As to these services, the parties' agreement only stated that Dana Partners' costs would not exceed $88,000.

{¶6}   Work on the "roof" project officially began in September 2007, and lasted approximately four months.  During the course of the work, Koivisto's company soon began to perform certain duties that had not been referenced in the agreement between it and Dana Partners.  For example, Koivisto's company started to dispose of the scraps Connell's workers generated in removing the old roof.

{¶7}   Each month during the project, Koivisto's company sent Dana Partners a numbers of invoices covering the work performed.  These invoices were separated into one of four categories.  For example, the company sent separate invoices for managing the construction site and for providing the "protection" services.  Furthermore, included in the invoices were statements of the costs of the following expenses: (1) the wages of Koivisto's company employees; (2) the wages of subcontractors hired by Koivisto; and (3) payments for certain rental equipment.  Upon receiving each invoice, Dana Partners promptly paid it, never questioning the legitimacy of the expenses.

{¶8}   Connell did not submit any invoices for its work until near the conclusion of the job.  When Thompson reviewed the invoices on behalf of Dana Partners, a dispute arose concerning whether Connell was overcharging for the work it performed.  As a result of this dispute, Thompson decided to again review the Kiovisto invoices that had

3

previously been paid. As part of his investigation into the matter, Thompson asked Koivisto to personally give information supporting certain charges in the prior invoices. Kovisto never responded to Thompson's request.

{¶9} At some point after the completion of the "roof" project on the Dana Street facility, Koivisto created a new corporation in the state of Arizona. This new entity had the same name as Koivisto's Ohio company. In addition, the Arizona entity engaged in the same type of business as the Ohio company, i.e., construction.

{¶10} When Thompson and Koivisto were not able to settle the dispute as to the propriety of the charges in the invoices, Dana Partners instituted the underlying action against Koivisto personally and his two companies. In relation to the Ohio corporation, Dana Partners asserted claims in breach of contract and fraud. Regarding the Arizona corporation, the complaint alleged that the new company could be found liable for the debt of the Ohio corporation because it was merely a successor in interest of the Ohio entity. As to Koivisto himself, Dana Partners asserted that the corporate veil of both companies should be pierced so that he could be found personally liable.

{¶11} As part of the allegations in its complaint, Dana Partners stated that it had been agreed that Koivisto and his company would predicate its work invoices upon its actual costs and a reasonable markup for profits and overhead. In their answer under Civ.R. 12, the three defendants maintained that the parties to the underlying agreement had a prior course of dealing as to the manner in which the charges for the completed work would be calculated. Moreover, during the course of discovery, Koivisto averred in a deposition that he had based the charges in the invoices upon a national estimator's guide entitled "RSMeans." Koivisto's use of the national guide resulted in substantially

4

higher charges for the costs of the rental equipment, the wages of the subcontractors, and the wages of the company employees.

{¶12} A one-day bench trial was held in November 2010. In support of its claims for relief, Dana Partners primarily relied upon the testimony of Thompson and Engineer Sauer. In relation to the cost of certain equipment Koivisto used on the project, Dana Partners presented the testimony of the manager of a local rental entity. In response, Koivisto testified on behalf of his two companies and himself.

{¶13} In its final judgment, the trial court found in favor of Dana Partners on its claim for breach of contract. Specifically, the court found that there had been a meeting of the minds between the parties that the project would be billed at actual costs, plus a reasonable markup. As to damages, the trial court determined that Koivisto's Ohio company overcharged Dana Partners a total of $137,115.83, and entered judgment against both the Ohio and Arizona companies for that amount. Regarding the fraud claim, the court concluded that Koivisto himself had not engaged in any fraudulent acts because RSMeans was an acceptable authority for setting costs. Based upon this, it was further held that the corporate veils of Koivisto's companies could not be pierced.

{¶14} In bringing the initial appeal from the foregoing judgment, Koivisto and his two companies, as appellants/cross-appellees, have raised three assignments of error:

{¶15} "[1.] The trial court erred in finding the parties had a meeting of the minds for an actual costs plus reasonable mark-up for overhead profit contract but not an RS Means cost data contract.

{¶16} "[2.] The trial court erred in finding specific percentages for the reasonable markup and in setting forth a number for actual costs that was inaccurate.

5

{¶17} "[3.] The trial court erred in finding against both the Arizona and the Ohio corporations when there was no evidence presented that the Arizona corporation was part of the contract."

{¶18} Under their first assignment, appellants challenge the trial court's factual finding that there was a meeting of the minds that the "actual costs" method would be employed to determine the amount to be charged for the work performed in accordance with their "plan protection" agreement. Specifically, appellants contend that no evidence was presented showing an objective manifestation on their part to agree to that specific method of calculation. In support of their contention, they note that the parties' written correspondences concerning this agreement did not contain any precise language as to this point.

{¶19} "To prevail on a contract action, the complaining party must prove all of the essential elements of a contract, including an offer, acceptance, manifestation of mutual assent, consideration, and certainty as to the essential terms of the contract. * * *. In order for a party to be bound to a contract, the party must consent to its terms, the contract must be certain and definite and there must be a meeting of the minds of the parties. * * *." (Citations omitted.) *Ameritech Publishing, Inc. v. Mayfield*, 7th Dist. No. 10 MA 27, 2011-Ohio-2971, ¶13.

{¶20} As previously discussed, the "roof" contract between Dana Partners and Koivisto basically had two distinct parts: management of the construction site and "plan protection." As to the latter aspect of the contract, the trial evidence readily shows that the governing terms were not set forth in a single written document. Instead, the contract was formed through the exchange of two written correspondences in July 2007,

6

approximately two months before the installation of the new roof began. The first correspondence was sent by Koivisto to Thompson and Dana Partners. In addition to stating a brief description of the "protection" which would be provided, the Koivisto letter indicated that the total contract price for the protection would be $88,000. His letter also stated that the extent of the protection coverage would be consistent with a prior bid that had been submitted by Connell.

{¶21} Approximately three weeks after receiving the Koivisto letter, Thompson sent a return correspondence on behalf of Dana Partners. Unlike the Koivisto letter, the Thompson correspondence only referenced the "protection" aspect of their agreement. Specifically, Thompson indicated that his correspondence was intended to serve as a purchase order for the protection services. In regard to the price for such services, the Thompson correspondence had the following sentence: "Said work will be completed at a not to exceed cost of $88,000.00."

{¶22} Besides introducing copies of these two correspondences into evidence at trial, Dana Partners also presented a copy of a contract bid that Connell had mailed to Thompson in relation to the installation of the new roof. Under the original proposal for the entire project, Connell had intended to also provide the protection services for Dana Partners. Ultimately, the parties agreed that the "protection" work would be transferred from Connell to Koivisto's company. This switch was referenced and explained as part of a note in Connell's contract bid. As to the price for the protection services, Connell's bid indicated that Koivisto was to provide the work "at a cost Not-to-Exceed 88,000.00."

{¶23} Before the trial court, Koivisto did not contest that the language in the Thompson reply correspondence was controlling as to the calculation of the amount his

company could charge for the protection services; i.e., the contract price would be at a cost "not to exceed" $88,000. However, Koivisto did contend that the phrase "not to exceed" must be interpreted in light of the parties' prior course of dealing. As part of his direct testimony, Koivisto stated that his company had been hired to perform other work for Thompson and Dana Partners in the years prior to the "roof" project. He also stated that, in billing Thompson for the prior work, he had always used the "RSMeans" guide to set his costs, and that Thompson had never questioned the prior bills. Based upon this, Koivisto indicated that, in determining the amount to be charged under the "protection" aspect of the "roof" contract, he had merely used the procedure he had followed for the prior work.

{¶24} In contrast, it was the position of Dana Partners that the disputed phrase had to be construed in light of the industry standard for construction in Trumbull County, Ohio: i.e., the usage of trade. At trial, Thompson expressly testified that, in light of his years of experience in the local construction industry, he was aware that the phrase "not to exceed" had a specific meaning in a construction contract. According to Thompson, if a contract stated that the costs of a service would not exceed an exact dollar amount, it meant that "I will be billed at actual costs plus a reasonable markup" for overhead and profits. This testimony was collaborated by Engineer Sauer, who also testified that he had sufficient experience in Trumbull County to know the special meaning given to the disputed phrase.

{¶25} Under Ohio law, evidence of usage of trade or prior course of dealing can be admitted for purposes of clarifying an indefinite contractual term. *Baldwin v. Rieger*, 11th Dist. No. 2001-T-0106, 2002-Ohio-4368, ¶17, quoting *Nilavar v. Osborn*, 127 Ohio

App.3d 1, 14 (2nd Dist.1998). In regard to the admissibility of "usage of trade" evidence specifically, the Sixth Appellate District has noted:

{¶26} "'Evidence of a custom or usage *existing at the time of a contract* is frequently admitted for the purpose of explaining the contract or ascertaining the understanding of the parties to it, interpreting the otherwise indeterminate intention and acts of the parties, explaining words or technical terms, or showing that the mode in which the contract has been performed is the one customarily followed by others engaged in the same calling or trade.' (Footnotes deleted and emphasis added.)" *Marisay v. Perrysburg Machine & Tool, Inc.*, 37 Ohio App.3d 35, 38 (6th Dist.1987), quoting 54 Ohio Jurisprudence 2d, Usages and Customs, Section 14, at 453-455 (1962).

{¶27} In order to qualify as a "usage of trade," the use of the dispute contractual language must occur so regularly within a vocation or trade "'as to justify an expectation that it will be observed with respect to a particular agreement.'" *Fidelity Mortgage Corp. v. Bruno*, 2nd Dist. No. 1544, 1981 Ohio App. LEXIS 10437, *9, quoting Restatement of Contracts 2d, Section 221 (1981). Furthermore, a contract should only be interpreted consistent with a usage of trade "'if each party knows or has reason to know of the usage and neither party knows or has reason to know that the other party has an intention inconsistent with the usage." *Id.* Finally, even though the existence of a usage of trade must be proven by clear and satisfactory evidence, the ultimate determination to construe the contract in light of the usage of trade lies within the discretion of the trier of fact. *Id.* at *10.

{¶28} In our case, the trial court expressly found that there had been a meeting

9

of the minds between the parties that the protection services would be billed by Koivisto at actual costs, plus a reasonable markup. The court further found that there had been no meeting of the minds regarding the use of the "RSMeans" guide. Thus, it is readily apparent that, in rendering its findings of fact, the court concluded that Dana Partners' evidence concerning the usage of trade should be accorded greater weight than Koivisto's testimony concerning the prior course of dealing.

{¶29} The trial transcript indicates that, during the course of their respective direct examinations, both Thompson and Engineer Sauer testified that they had over 20 years of experience in the local construction industry. Each man also testified that whenever he had seen the inclusion of the "not to exceed" language in the "price" term of a construction contract, it had always meant that the bill of the contractor would be limited to his actual costs and a reasonable markup for profit and overhead. Furthermore, our review of the transcript does not reveal any legitimate reason why the credibility of either witness would be doubted on this particular point. Thus, the record before this court contains competent, credible evidence upon which the trial court could justifiably find that the phrase "not to exceed" was a term of art in the Trumbull County construction industry, and that the "usage of trade" testimony of Thompson and Sauer helped to explain the meaning of the phrase in the context of the written contract between Dana Partners and Koivisto.

{¶30} As part of the evidence, it was further established that Koivisto had been operating his own construction company in Trumbull County for over 12 years when the contract for the protection services was negotiated; therefore, it could be inferred that he was also aware of the meaning of the phrase "not to exceed" in the context of a

10

construction contract. Based upon this, the trial court was justified in also finding that, by not objecting to the language in Thompson's reply correspondence in July 2007, he was agreeing to only charge Dana Partners for his actual costs and a reasonable markup in regard to the rental equipment, the wages of his employees, and the wages of the subcontractors. Accordingly, because the evidence supported the trial court's ultimate conclusion that there had been a meeting of the minds as to all terms of the "plan protection" contract, appellants' first assignment is without merit.

{¶31} Under their second assignment, appellants assert that the trial court erred in making specific findings concerning the amount of a reasonable markup for the three different types of charges under the protection services. They submit that such findings should not have been made because there was no meeting of minds as to amounts of the markups. According to them, there was no discussion between the parties as to the amount of the markups until after Dana Partners had paid all of the invoices.

{¶32} In addition to its finding on the "not to exceed" phrase, the trial court also found that: (1) a reasonable markup on the wages of the Koivisto company employees was 20 percent; (2) a reasonable markup on the wages of the subcontractors was 10 percent; and (3) a reasonable markup on the costs of the rental equipment was 18 percent. The trial transcript again shows that these findings were predicated upon the testimony of Thompson and Engineer Sauer. That is, each man testified, based upon his general knowledge of the construction industry in Trumbull County, as to what would be viewed as a reasonable markup under each of the three types of charges. To the extent that both men relied upon their experience in the local industry, this particular testimony was essentially a continuation of their respective descriptions of the meaning

11

of the phrase "not to exceed" in the context of a construction contract.

{¶33} Given that the purpose of the "markup" testimony was to fully explain the intent of the parties in relation to the inclusion of the "not to exceed" phrase in the "plan protection" contract, it was also admissible as evidence of the governing usage of trade in the local construction industry. Furthermore, since the trial transcript does not show that the credibility of Thompson or Sauer was successfully challenged, the trial court did not abuse its discretion in basing his factual findings upon their testimony. Thus, since there was some competent, credible evidence upon which the trial court could conclude that there had been a meeting of the minds as to the percentages of the markups for the three types of charges, appellants' second assignment also lacks merit.

{¶34} Under their final assignment, appellants contend that the trial court erred in holding Koivisto's Arizona company liable for the judgment debt of the Ohio corporation. Regarding this point, appellants emphasize that the Arizona entity was not a party to the agreement with Dana Partners, and had not even been formed until after the work on the roof was completed. In response, Dana Partners assert that the trial court's holding was correct because the evidence supported the finding that Koivisto essentially merged the Ohio company into the new Arizona entity.

{¶35} "The well-recognized general rule of successor liability provides that the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation." *Welco Industries, Inc. v. Applied Cos.*, 67 Ohio St.3d 344, 346 (1993). However, Ohio law also recognizes four exceptions to the basic rule; i.e., there can be successor liability when: (1) there is an express or implied agreement by the buyer corporation to assume the liabilities; (2) there is a *de facto* merger of the two

12

corporations; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the sale of the original corporation was entered into fraudulently for the exact purpose of escaping liability. *Id.* at 347.

{¶36} In our case, Dana Partners focuses its argument upon the second of the four exceptions: *de facto* merger. Generally, in order for the doctrine of de facto merger to apply, there must exist a sufficient nexus between the two corporate entities to warrant the imposition of successor liability. *Permasteelisa CS Corp. v. The Airolite Co.*, S.D.Ohio No. 2:06-cv-569, 2007 U.S. Dist. LEXIS 95860, *31 (Dec. 31, 2007), quoting *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 244 N.W.2d 873, 880 (1976). Under Ohio law, the determination of whether the required nexus is present in a given case turns upon the consideration of the following four factors: (1) whether there was a continuation of the prior business activity and corporate personnel; (2) whether there was continuity of shareholders based upon a sale of assets in exchange for stock; (3) whether the existing company was immediately dissolved; and (4) whether the new entity assumed the ordinary liabilities and obligations of the existing company. *State ex rel. H.C.F. Inc. v. Ohio Bur. of Workers' Comp.*, 80 Ohio St.3d 642, 648 (1997), quoting *Welco, supra,* at 349.

{¶37} The *H.C.F. Inc.* standard is stated in the conjunctive. In our case, though, only some of the common features of a de facto merger existed. For example, the testimony established that the corporate personnel of the two companies, i.e., Rudolph F. Koivisto as the sole owner, are identical. In addition, there was some testimony tending to show that Koivisto's Ohio corporation essentially ceased operations around the same time that the Arizona entity was formed.

13

{¶38} However, the evidence does not show that the Arizona entity assumed the day-to-day obligations of the Ohio company. More importantly, there was no showing that the Arizona entity assumed the actual business activity of the Ohio company. That is, the Arizona entity will only be engaging in construction work in Arizona, not Ohio. Thus, this was not a situation in which Koivisto created a second corporation, and then transferred the existing business opportunities and assets of his original Ohio company to the new entity. Instead, Koivisto was discontinuing his Ohio business to start a totally new business in a different state.

{¶39} As part of its argument on the "*de facto* merger" issue, Dana Partners makes the general assertion that the Arizona company was simply a continuation of the Ohio company. As previously mentioned, the continuation of the original corporation by a purchaser corporation is the third recognized exception to the general rule against successor liability. Although Dana Partners did employ the word "continuation" in its appellate brief, it did not cite to the separate standard for this exception and did not develop a separate argument on this point. Despite this, we will address the question of whether the third exception is applicable.

{¶40} In describing the "mere-continuation" exception, the Supreme Court of Ohio has stated:

{¶41} "We have held that the basis of this [exception] is the continuation of the corporate entity, not the business operation, after the transaction. [*Flaugher v. Cone Automatic Machine Co.*, 30 Ohio St.3d 60 (1987)]. Such would be the case when 'one corporation sells its assets to another corporation with the same people owning both corporations. Thus, the acquiring corporation is just a new hat for, or reincarnation of,

14

the acquired corporation. This is actually a reorganization.' [*Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 449 (1976)]. This type of transaction is executed to escape liabilities of the predecessor corporation. [*Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145, 1151 (C.A.1, 1974)]. Because the goal is to escape liability, inadequacy of consideration is one of the indicia of mere continuation. *Jackson v. Diamond T. Trucking Co.* (1968), 100 N.J.Super. 186, 196, * * *." *Welco*, at 350.

**{¶42}** Pursuant to the Supreme Court precedent, the "mere-continuation" exception only applies when the assets of the original corporation are acquired by a new corporation which has the same owner. The assets of Koivisto's Ohio company, such as its heavy equipment, employees, and contracts, were not transferred to the Arizona company. Regarding the Ohio company's construction equipment, Koivisto expressly testified that, before the "roof" project began, he disposed of the Ohio company's heavy equipment, and only retained some fabricators, scaffolding, and small hand tools. In light of this, Koivisto rented equipment needed to perform the required work on the "roof" job.

**{¶43}** Similarly, there is no evidence showing that any of the employees of the Ohio company became employees of the Arizona entity. The evidence shows that Koivisto already released the majority of his Ohio employees even before he entered into "roof" contract with Dana Partners. As a result, although Koivisto did hire some of his former employees to work on the "roof" project, he had to designate them as subcontractors for purposes of his invoices. In addition, he also hired temporary help to work as employees for his Ohio company.

**{¶44}** Given the disposition of the heavy equipment and the release of its

15

employees, Koivisto's Ohio company had minimal assets before it entered into the contract with Dana Partners for the "roof" job. The rationale supporting the "mere-continuation" exception is that a corporation cannot move assets that were existing in the corporation and available to satisfy a potential judgment to a successor corporation for inadequate consideration in order to avoid liability. Koivisto Ohio did not have any significant assets at the time it contracted with Dana Partners, and there is no evidence any retained equipment was transferred to Koivisto Arizona for inadequate consideration. Absent evidence of an asset transfer, Koivisto Arizona has no assets of Koivisto Ohio from which Dana Partners could have satisfied a judgment in the event of breach by Koivisto. *See Welco*, at 350.

**{¶45}** Pursuant to Koivisto's testimony, he intended for his Arizona company to perform construction work similar in nature to the work his Ohio company had done through the years. However, in the absence of any transfer of assets between the two corporations, this single similarity is not sufficient to establish that the Arizona company was engaged in a continuation of the Ohio company's business. *Cf., Mohammadpour v. Thomas,* 8th Dist. No. 85474, 2005-Ohio- 3853, ¶14. To this extent, Dana Partners failed to carry its burden of proving that the "mere-continuation" exception is applicable.

**{¶46}** Finally, since Koivisto's Ohio company was never sold to his Arizona company, the fourth exception to the general rule of no successor liability is not applicable. That is, this is not a situation in which Koivisto Ohio was fraudulently sold to the Arizona company for the purpose of escaping liability.

**{¶47}** Taken as a whole, the facts in this case weighed in favor of the finding that Koivisto did not engage in any "transaction" which resulted in a *de facto* merger or a

continuation of the operations of his Ohio company. Therefore, since the Arizona company was not a successor in liability for Koivisto's Ohio entity and was not a party to the disputed contract between Koivisto and Dana Partners, the trial court erred in holding that it could be held responsible for the judgment debt. For this reason, appellants' third assignment is well taken.

{¶48} Dana Partners filed a timely cross-appeal from the trial court's final judgment, and advances two assignments of error for review:

{¶49} "[1.] The finding by the trial court that Koivisto did not commit fraud was contrary to the manifest weight of the evidence.

{¶50} "[2.] The finding by the trial court that insufficient evidence to pierce the corporate veil was presented was contrary to the manifest weight of the evidence."

{¶51} Since the two assignments under the cross-appeal are interrelated, they will be addressed together. As previously discussed regarding Rudolph F. Koivisto individually, Dana Partners sought personal liability for the contract overcharges by piercing the corporate veil of his Ohio company. As the factual foundation for this distinct claim, Dana Partners alleged that the piercing of the veil was warranted because Koivisto had acted fraudulently in submitting invoices which were not consistent with the terms of the "plan protection" agreement.

{¶52} Under the first assignment of its cross-appeal, Dana Partners asserts that the evidence it presented at trial established fraudulent behavior on the part of Koivisto. According to Dana Partners, given that there had been an agreement that the protection services would be billed on actual costs, Koivisto committed fraud by seeking payments for significantly larger amounts. Building upon this, Dana Partners further asserts that

17

the trial court erred in refusing to pierce the corporate veil and find Koivisto personally liable on the judgment.

**{¶53}** Pursuant to well-settled Ohio case law, three basic facts must be proven before a shareholder/owner of a corporate entity can be found legally responsible for a corporate debt:

**{¶54}** "'The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.'" *Dombroski v. Wellpoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, ¶18, quoting *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc*, 67 Ohio St.3d 274, paragraph three of the syllabus (1993).

**{¶55}** In *Dombroski*, the primary issue before the Ohio Supreme Court involved whether the piercing of the corporate veil should be allowed when the person exercising control over the corporation has engaged in an act that, although not illegal, was unjust or inequitable. In concluding that the general scope of the *Belvedere* standard should not be extended beyond fraud, an illegal act, or a similarly unlawful act, the *Dombroski* court emphasized that the purpose of the corporate veil would be defeated unless there was a strict limit to the instances in which the piercing of the veil was permissible. *Id.* at ¶27. Thus, the *Dombroski* court continued to follow the guiding proposition that piercing the corporate veil should only occurred in rare instances of extreme shareholder/owner

18

misconduct. *Id.* at ¶26.

{¶56} In our case, the evidence presented by Dana Partners was readily sufficient to establish the first and third prongs of the *Belvedere* standard. In relation to the first prong, Koivisto's own testimony on cross-examination indicated that he was the sole shareholder in his Ohio company; therefore, he had total control over the operation of the company. As to the third prong, the testimony of Richard Thompson established that Dana Partners sustained a financial "injury" as a result of Koivisto's failure to abide by the terms of the parties' agreement regarding the method for calculating the charges covering the protection services. Accordingly, for purposes of deciding whether Koivisto could be held personally liable for the overcharges, the sole dispute centered upon the second prong of the *Belvedere* standard; i.e., did the evidence of Dana Partners support a finding that Koivisto had acted fraudulently in submitting invoices that were not based upon his actual costs, plus a reasonable markup?

{¶57} In essence, Dana Partners' fraud claim was based upon the allegation that Koivisto had purposely made false representations in the monthly invoices concerning the amount due for the services rendered by his company. In order to prove a claim of fraudulent misrepresentation in a contract action, five basic elements must be satisfied: "(1) a false representation concerning a fact material to the transaction; (2) knowledge of the falsity of the statement or utter disregard for its truth; (3) intent to induce reliance on the misrepresentation; (4) reliance under circumstances manifesting a right to rely; and (5) injury resulting from the reliance." *Sanfillipo v. Rarden*, 24 Ohio App.3d 164, 166 (1st Dist.1985). In regard to the second element of the claim, it has been held that a finding of fraud cannot be predicated upon an innocent mistake of fact; rather, it must

19

be shown that the defendant had actual knowledge or was grossly negligent in failing to ascertain the truth. *Id.*

**{¶58}** Consistent with the foregoing precedent, the Third Appellate District has indicated that mere negligent behavior is not sufficient to establish fraud for purposes of piercing the corporate veil; rather, the behavior must either be purposeful or reckless in nature. *Advantage Bank v. Waldo Pub, LLC*, 3rd Dist. No. 9-08-67, 2009-Ohio-2816, ¶42.

**{¶59}** In considering the general elements for fraud as they relate to the second prong of the *Belvedere* standard, this court has expressly concluded that the decision to pierce the corporate veil cannot be based solely upon the failure to comply with a term of a contract:

**{¶60}** "A simple breach of contract, in the absence of a more substantial factual predicate indicative of some corporate malfeasance, with direct bearing on the plaintiff's injury, is insufficient to meet the second prong of the *Belvedere* test. To decide otherwise, would completely vitiate the holding in *Belvedere*." *Connolly v. Malkamaki*, 11th Dist. No. 2001-L-124, 2002-Ohio-6933, ¶34.

**{¶61}** As the grounds for its fraud assertion in this case, Dana Partners does not maintain that Koivisto had acted negligently in his performance of the "plan protection" contract. Instead, it is the position of Dana Partners that, despite the fact that Koivisto was aware that the terms of the contract required him to only bill for his actual costs and a reasonable markup, he still decided to use the RSMeans guide to calculate his costs and, therefore, overcharged for his company's services. To this extent, Dana Partners contends that the overcharges were intentional.

20

**{¶62}** In concluding that Koivisto had not engaged in any fraud in submitting his invoices, the trial court provided the following analysis:

**{¶63}** "It is not disputed that [Koivisto] did use the RS Mean's calculation as authority for establishment of his price. Furthermore RS Means is an acceptable authority. Therefore the Court finds no fraud or attempt to perpetrate a fraud. The Court also finds there is insufficient evidence in order to pierce the corporate veil as Dana Partners and managing partner, Dick Thompson, were well aware and had previously dealt with [Koivisto's] corporate entities."

**{¶64}** Although not expressly stated in the foregoing quote, it is readily apparent that the trial court's finding on the fraud issue was based upon Koivisto's testimony as to the parties' prior course of dealing. As previously noted, Koivisto testified that, in billing Dana Partners for work performed under prior contracts, he had always employed the "RSMeans" guide to set his company's costs. He further testified that, since Thompson had never contested the prior bills, he simply followed the identical procedure in billing Dana Partners on the "roof" project.

**{¶65}** As part of our earlier analysis as to the proper interpretation of the "not to exceed" clause, this court concluded that the trial court could justifiably decide to give more weight to Dana Partners' "usage of trade" evidence than Koivisto's "prior course of dealing" testimony. Nevertheless, this decision did not necessarily mean that Koivisto's testimony was not entitled to any weight. As the trier of fact, the trial court could have further found that Koivisto's testimony was entitled to some weight to the extent that it provided an explanation for his behavior during the performance of the "plan protection" contract.

21

{¶66} Specifically, in light of the "prior course of dealing" testimony, the trial court could have inferred that, despite the "meeting of the minds" at the original formation of the contract, Koivisto had acted in conformity with the parties' prior course of dealing in calculating the amount owed for the work performed by his company. In other words, Koivisto based his behavior upon what had been acceptable under the prior contracts between the parties. Given that it was shown that the "RSMeans" guide is a legitimate means for determining costs in the construction industry, the trial court could have also found that Koivisto had only acted negligently in not calculating his costs in compliance with the "not to exceed" clause in the contract. That is, while Koivisto acted purposefully in using the "RSMeans" guide because it was consistent with his prior performance, he did not expressly intend to breach the governing term of the contract.

{¶67} Based upon the foregoing findings, the trial court could justifiably conclude that this case involved a simple breach of contract, and that Koivisto did not deliberately attempt to overcharge Dana Partners for the work his company performed. In turn, this means that Koivisto could not be held personally liable for the debt of his corporation because there was some evidence to support the finding that he did not engage in any fraudulent behavior during his performance of the underlying contract.

{¶68} Pursuant to the foregoing discussion, the trial court's decision regarding Dana Partners' claim to pierce the corporate veil was not against the manifest weight of the evidence. Thus, both of Dana Partners' assignments of error in its cross-appeal are without merit.

{¶69} Based upon our holding under appellants' third assignment, it is the order of this court that the judgment of the Trumbull County Court of Common Pleas is

22

modified and affirmed as modified. That is, the judgment is hereby modified to state that Dana Partners is entitled to recover the sum of $137,115.83 only from Rudolph F. Koivisto's Ohio corporation, Koivisto Contractors and Erectors, Inc. Koivisto's Arizona corporation is no longer liable for the judgment debt.

DIANE V. GRENDELL, J., concurs,

CYNTHIA WESTCOTT RICE, J., concurs in part, dissents in part with Concurring/Dissenting Opinion.

_____

CYNTHIA WESTCOTT RICE, J., concurring in part and dissenting in part.

{¶70} I concur with the majority finding Koivisto's first two assignments of error are without merit. I also concur with the majority's decision denying Dana Partners' cross assignments of error. The trial court did not err when it found there was insufficient evidence to pierce the corporate veil because there was no evidence of fraud by Koivisto.

{¶71} However, I disagree with the majority's decision finding merit in Koivisto's third assignment of error alleging that the trial court erred in holding Koivisto's Arizona company liable for the debt of Koivisto Ohio. For the reasons that follow, I respectfully dissent.

{¶72} The trial court found liability under the contract against Koivisto "in its Ohio and its Arizona forms." Thus, the trial court found Koivisto to be one business with two names or "forms." The trial court does not explain what facts it utilized in making this

23

finding. Therefore, it must be determined whether this finding was supported by some competent, credible evidence. *McDonald Indus. Park Prop. Owners Ass'n v. Am. Indus. Renovation, Inc.*, 11th Dist. No. 2003-T-0075, 2004-Ohio-3509, ¶9, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{¶**73**} In *Welco Industries, Inc. v. Applied Companies*, 67 Ohio St.3d 344 (1993), the Supreme Court of Ohio held that "a corporation that purchases the assets of another corporation is not liable for the contractual liabilities of its predecessor corporation unless 1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a de facto consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability." *Id.* at 349. Successor corporate liability under any of these theories requires a transfer of assets from the original to the successor corporation. *Cattron, Inc. v. Overhead Crane & Hoist, Inc.*, 32 Ohio App.3d 80, 81 (1st Dist.1987). However, the case law does not specify the type of transfer necessary; whether the transfer of proceeds from the sale of assets suffices; whether the transfer must occur at one time or whether a series of transfers suffices; or how or when the transfer(s) must occur.

{¶**74**} There is no evidence in this case that would support a finding that there was an express or implied agreement by the Arizona company to assume the liabilities of the Ohio company. Thus, the first prong of *Welco* does not apply. The second prong of *Welco* is also inapplicable here. The majority conducts a thorough analysis of the facts in this case and correctly determines that there was no de facto merger.

{¶**75**} The record does not support the majority's conclusion that "the evidence

24

does not indicate that the Arizona entity was created merely to escape potential liability." Conversely, there was no factual finding by the trial court that the Arizona entity was created merely to escape potential liability. I believe the facts presented do not support a finding either way under the fourth prong of *Welco.*

{¶76} Mr. Koivisto testified at trial that he lives in Arizona and that he has been working out of Arizona. Appellants' counsel stated in trial that Mr. Koivisto moved to Arizona in 2000 due to his wife's health and he was "winding down his Ohio operation and keeping more of his time and business in Arizona."

{¶77} Mr. Koivisto testified that he formed his Arizona corporation with the same name as his Ohio corporation in February 2008, after the completion of the disputed contract with Dana. The Ohio company was an ongoing entity while he was working construction jobs in Arizona as Koivisto Ohio. He made no initial contribution of assets or capital to the Arizona corporation. Mr. Koivisto testified that he had power tools, fabrication equipment, and scaffolding here in Ohio when he started working on the Dana project. He had previously "got rid of" most of the rolling stock, scissor lifts, dump trucks, and excavating equipment. The record does not support the majority's statement that Koivisto's Ohio company, including its heavy equipment, employees, and contracts were not transferred to the Arizona company. Mr. Koivisto stated that he was the sole owner of both corporations, and exercised complete control over both.

{¶78} Between 2000 and 2008, Koivisto Ohio was operating out of Arizona. Mr. Koivisto testified concerning a project he worked on in Arizona for Dick's Sporting Goods during this period. After Koivisto Arizona was formed in February 2008, the tools and equipment previously owned by Koivisto Ohio and used in Arizona were obviously

used by Koivisto Arizona in its business. Mr. Koivisto said that the Arizona company engaged in the same business that had formerly been performed by the Ohio company. Following the formation of Koivisto Arizona, all operations of Koivisto Ohio ceased and were continued by Koivisto Arizona.

{¶79} As a result, the trial court's finding of liability on the part of Koivisto's Arizona company could only be affirmed under the third *Welco* prong. I believe there was some competent, credible evidence that Koivisto's Arizona company was a mere continuation of his Ohio company.

{¶80} Successor corporation liability can be found if the record would support a finding of mere continuation, which is the "continuation of the corporate entity, not the business operation, after the transaction." *Welco Indus., Inc., supra,* at 350. An example of this theory occurs when "one corporation sells its assets to another corporation with the same people owning both corporations. Thus, the acquiring corporation is just a reincarnation of the acquired corporation. *Id.* Inadequate consideration is indicia of mere continuation. *Id.*

{¶81} The majority correctly notes that Mr. Koivisto stated that he was the sole owner of both companies; that the new entity would be engaging in the identical business as the Ohio company; and that the Ohio company no longer had any assets or work. Mr. Koivisto testified that he considered shutting down the Ohio company, but was advised to keep it open in case he might need to do work in Ohio.

{¶82} The exhibits before the trial court reinforced Koivisto's testimony regarding his ongoing business activity in Arizona prior to becoming involved with the Dana contract. He utilized his Arizona address when renting equipment or making materials

purchases for the Dana contract. This was the same address he used when incorporating his Arizona company after completion of the Dana contract.

{¶83} Since Koivisto Ohio owned tools and fabrication equipment when it began working on the Dana project in 2007, and its business is now performed by Koivisto Arizona, the evidence supported the finding that, upon the incorporation of the Arizona company in 2008, Koivisto Arizona acquired all assets formerly owned by Koivisto Ohio. This acquisition constituted a transfer of assets from the Ohio to the Arizona entity. Further, because Koivisto Ohio now has no assets or funds, the evidence supported the finding that, in acquiring Koivisto Ohio's assets, the Arizona company did not pay adequate or, in fact, any consideration for them. Thus, the evidence supported the finding that Koivisto Arizona is a mere continuation of Koivisto Ohio as a result of the foregoing transfer and the same person owning and operating both companies. *See e.g. Mohammadpour v. Thomas*, 8th Dist. No. 85474, 2005-Ohio-3853, ¶15.

{¶84} Based upon the testimony and evidence before the court, the trial court's finding of liability on the part of Koivisto's Arizona company is supported by the mere continuation theory of successor corporate liability. As a result, I cannot find that the trial court's finding was against the manifest weight of the evidence. Therefore, I would affirm the trial court.