[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, Slip Opinion No. 2019-Ohio-4716, 2019-Ohio-4716.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-4716

BEVERAGE HOLDINGS, L.L.C., APPELLANT, *v.* 5701 LOMBARDO, L.L.C., D.B.A. VALENTINO-VAV,[1] L.L.C., APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.,* Slip Opinion No. 2019-Ohio-4716.]**

*Contract dispute—Plain language of contract provision does not lead to manifest absurdity—Court of appeals' judgment reversed.*

(No. 2018-0616—Submitted May 21, 2019—Decided November 19, 2019.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 104559, 2017-Ohio-7090.

_____

**O'CONNOR, C.J.**

{¶ 1} This case involves the sale of a franchise business and the real property on which it sits.  The parties structured the agreement for the sale of the

_____

1. In its complaint, appellant identified appellee's separate entity as Valentino-Val, L.L.C.  The secretary of state's records as well as evidence in this case show that the correct name is Valentino-VAV, L.L.C.  The caption in this case has been changed accordingly.

real property to include several adjustments that would be made to the overall purchase price based on circumstances present at the time of the closing. When the closing was initiated, however, the parties disputed how one of the credit provisions should be interpreted.

{¶ 2} The trial court granted summary judgment in favor of the buyer, plaintiff-appellant, Beverage Holdings, L.L.C., finding that the plain language of the disputed credit provision supported its position. The Eighth District Court of Appeals initially affirmed, 2017-Ohio-2983, but it later granted reconsideration and reversed on the ground that the plain language of the provision was manifestly absurd, 2017-Ohio-7090. It therefore remanded the case to the trial court for consideration of evidence concerning the provision's meaning.

{¶ 3} For the reasons discussed below, we hold that the Eighth District erred. We therefore reverse.

## I. Relevant Background

{¶ 4} Defendant-appellee, 5701 Lombardo, L.L.C., d.b.a. Valentino-VAV, L.L.C., ("Lombardo"), owns real property in Independence, Ohio, on which it operated a preschool and daycare-center franchise. As of 2011, Lombardo owed $1,726,000 on several loans on the property, and it sought to sell both the property and the franchise to Beverage Holdings. The parties conducted the real-property and franchise sales through separate transactions.[2]

{¶ 5} The sale of the franchise business to Beverage Holdings took place in one transaction, and Beverage Holdings began operating the business immediately. That transaction is not directly at issue in this appeal. The transaction for the sale of the real property was more complicated, however, because of a penalty that would be imposed by one of Lombardo's lenders if its loan was paid off early. To

---

2. The parties used related entities to complete the transactions, at least in part, but for the purposes of this opinion, we refer to the entities used by Lombardo simply as Lombardo and the entities used by Beverage Holdings as Beverage Holdings.

2

effectuate the sale of the real property, the parties entered into agreements on April 29, 2011. Relevant here, one agreement was for the sale of the real property (the "Real Estate Purchase Agreement"). The parties set the purchase price at $1,726,000, but they agreed that the closing would not take place until a date in the future, to be selected after Beverage Holdings had delivered to Lombardo a notice of its intent to close the transaction. The second was a lease of the property designed to be in effect before the closing occurred (the "Lease Agreement"). Beverage Holdings agreed to pay $12,500 per month in rent.

{¶ 6} In the Real Estate Purchase Agreement, the parties also agreed that several credits would be applied to reduce the purchase price at the time of closing. One credit would reduce the purchase price by the amount the principal on Lombardo's loans was reduced between the date of the agreement and the date of the closing. ("Reduction in Principal Credit"). Another credit would reduce the purchase price by the amount of "[r]ents received by [Lombardo] from [Beverage Holdings], prorated to date of closing" ("Rents Credit"). Beverage Holdings also agreed that, if it elected to close the transaction before February 15, 2018, and thereby caused Lombardo to be required to pay the early-termination penalty to one of its lenders, Beverage Holdings would pay the penalty for Lombardo.

{¶ 7} On March 12, 2015, after leasing the property for approximately four years, Beverage Holdings notified Lombardo that it intended to close the real-estate transaction. In the notice, Beverage Holdings asserted that it was entitled to a Rents Credit of $462,500. Combining that credit with others provided in the agreement, including the Reduction in Principal Credit, Beverage Holdings asserted the total purchase price was reduced to $1,202,110.09. Lombardo rejected the notice, asserting that Beverage Holdings's calculation of the Rents Credit was not in line with what was originally contemplated by the parties.

{¶ 8} Beverage Holdings sued Lombardo, seeking, among other things, a declaratory judgment that its interpretation of the Rents Credit was correct. The

trial court granted summary judgment to Beverage Holdings as to its request for declaratory judgment interpreting the Rents Credit clause, finding that the plain meaning of the Rents Credit clause was unambiguous and in line with the position of Beverage Holdings. The Eighth District initially affirmed on appeal, but it subsequently granted reconsideration and reversed.

{¶ 9} In its decision on reconsideration, the Eighth District agreed with the trial court that "standing alone, the plain language of the [Rents Credit] clause stating that the purchase price of the property would be decreased by '[r]ents received by [Lombardo] from [Beverage Holdings], prorated to date of closing' appears to apply to all rents received from [Beverage Holdings], not just the rent paid during the closing period." 2017-Ohio-7090 at ¶ 7. But it declined to apply the plain language in Beverage Holdings's favor because it believed the plain language led to a "manifestly absurd result." *Id.*, citing *Cincinnati Ins. Co. v. Anders*, 99 Ohio St.3d 156, 2003-Ohio-3048, 789 N.E.2d 1094, ¶ 34. Specifically, the court of appeals believed that because the parties recognized from the outset that "Lombardo's financing at the time made it impractical to currently close the transaction and, in fact, that the sale might not close for 'several years,' " it would be absurd to conclude that Lombardo intended to provide Beverage Holdings with credits against the purchase price for *both* (1) all rents paid between the start of the agreement and the closing (pursuant to Beverage Holdings's interpretation of the Rents Credit clause) and (2) the amount by which the principal on the loans was reduced during that time (pursuant to the Reduction in Principal Credit clause). It therefore remanded the case to the trial court for "fact-finding to give the contract the most sensible and reasonable interpretation." *Id.* at ¶ 7.

{¶ 10} Beverage Holdings appealed to this court, and we granted discretionary review.

4

## II. Analysis

### A. *The plain language of the Rents Credit*

{¶ 11} We review de novo the Eighth District's decision regarding the propriety of the trial court's grant of summary judgment in favor of Beverage Holdings. *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, 767 N.E.2d 707, ¶ 24. Summary judgment should be granted only when "there is no genuine issue as to any material fact and * * * the moving party is entitled to judgment as a matter of law." Civ.R. 56(C).

{¶ 12} In its first proposition of law, Beverage Holdings argues that the plain language of the Rents Credit provides that it is entitled to a credit for all rent payments made during the life of the Lease Agreement and that the Eighth District erred by concluding that the plain language resulted in a manifest absurdity. Lombardo counters that Beverage Holdings's interpretation of the Rents Credit is, in fact, manifestly absurd and, therefore, the Eighth District correctly remanded the case for consideration of extrinsic evidence regarding the parties' intent. We agree with Beverage Holdings.

{¶ 13} Our legal standards for the interpretation of contracts are well established. We seek primarily to give effect to the intent of the parties, and we presume that the intent of the parties is reflected in the plain language of the contract. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. As a result, if the language of a contract is plain and unambiguous, we enforce the terms as written, and we may not turn to evidence outside the four corners of the contract to alter its meaning. *See id.*; *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53, 544 N.E.2d 920 (1989) ("Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence"). When considering the language of a particular contractual provision, "[c]ommon words * * * will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clear from the

face or overall contents of the agreement." *Anders*, 99 Ohio St.3d 156, 2003-Ohio-3048, 789 N.E.2d 1094, at ¶ 34, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus.

{¶ 14} As noted above, the Rents Credit clause provides that the purchase price shall be reduced by the amount of "[r]ents received by [Lombardo] from [Beverage Holdings], prorated to date of closing." Beverage Holdings argues that the clause creates a credit for all rent paid between the beginning of the lease and the closing of the sale of the real property. For example, if the agreements were signed on January 1 of a given year and the closing occurred on May 8 of that year, a Rents Credit would be awarded for rent paid for the entire period between January 1 and May 8.

{¶ 15} Lombardo, by contrast, argues that because the full amount of each month's rent was paid by Beverage Holdings in advance, at a time when the exact date of the closing might not have been known, the Rents Credit is properly understood as providing a credit for rent covering the partial-month period *after* the closing. Using the same example, a Rents Credit would be awarded for rent paid for the period between May 9 and May 31.

{¶ 16} The language of the Rents Credit is plain and unambiguous, and it supports only the interpretation asserted by Beverage Holdings. The language is broad and clear, providing that a credit would be provided for all "rents" paid and that the credit would be prorated to the date of closing. Notably, the parties made clear in the Lease Agreement that Beverage Holdings's obligation to pay rent would extend only to the date of the closing, at which point, of course, it would become the owner of the property, and the proration language in the Rents Credit makes clear that the credit is limited to the same date. The interpretation proffered by Lombardo would be a plausible reading of the clause only if it contained different language stating that the credit applied to the period *after the date of the closing*. Because there is no such language in the Rents Credit clause, we reject the

interpretation advanced by Lombardo. *See Alexander*, 53 Ohio St.2d at 246, 374 N.E.2d 146 ("where the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties").

### B. The dissenting opinions

{¶ 17} The first dissenting opinion asserts that the plain language of the Rents Credit has only one reasonable interpretation, namely that it provides Beverage Holdings with a credit only for the portion of the last month's rent attributable to the period *after* the closing. The second dissenting opinion asserts that this post-closing-only interpretation of the Rents Credit is at least plausible, and because it also believes our interpretation is plausible, it would find that the Rents Credit is ambiguous and remand the case to the trial court for consideration of extrinsic evidence. We disagree with both views. Although both dissenting opinions raise questions about our interpretation, that is not enough to support their ultimate conclusions. Both dissenting opinions lack a convincing affirmative explanation for why the alternative, post-closing-only interpretation is plausible. Without that, the approaches of both opinions lack merit.

{¶ 18} The most notable claims of the dissenting opinions are their assertions that the proration language is rendered superfluous under our interpretation and that the proration language has no meaning unless the Rents Credit applies to only the post-closing portion of the final month of the lease. We do not agree with either point. As we stated above, the proration language is not superfluous under our view because it can reasonably be understood as ensuring that the end date for the Rents Credit is clearly defined and matches the end date for Beverage Holdings's obligation to pay rent. The dissenting opinions' post-closing-only interpretation also fails to provide relevant meaning to the proration language because, under their interpretation, the Rents Credit *as a whole* would be superfluous. If the parties wanted the last month's rent to be "distributed

proportionately between the buyer and the seller, as determined by the closing date," dissenting opinion of Kennedy, J., at ¶ 40, there was no need to create a special "Rents Credit" to achieve that result. Even without such a credit, Beverage Holdings would have had a legal right to receive back the portion of the last month's rent covering the period *after* the closing, because its obligation to pay rent extended only to the date of the closing and no further. The dissents' avoidance-of-surplusage argument is therefore not convincing.

{¶ 19} Ultimately, it is better to put theories of surplusage to the side and to simply look to the text of the contract. The post-closing-only interpretation proffered by the dissenting opinions would be plausible only if additional language were included in the credit, language clearly indicating that the credit applies only to the post-closing period of the last month of the lease. Because the Rents Credit does not contain any such language, the only reasonable interpretation is the one we find here: that the Rents Credit applies to all rents received during the life of the lease.

## C. Manifest absurdity

{¶ 20} We also reject the conclusion of the Eighth District that the plain language of the Rents Credit leads to a manifest absurdity. The Eighth District relied on our statement in *Anders*, 99 Ohio St.3d 156, 2003-Ohio-3048, 789 N.E.2d 1094, at ¶ 34, that common words in a contract should "be given their ordinary meaning unless manifest absurdity results * * *." Although we have repeated this statement on numerous occasions, *e.g.*, *Aultman*, 46 Ohio St.3d at 54, 544 N.E.2d 920; *Alexander*, at paragraph two of the syllabus, this exception to the plain-meaning rule is narrow in scope and is necessarily limited by the meaning of the term "manifest absurdity" itself. First, the word "absurd" conveys a degree of extremeness. Contract language is absurd not simply when it is unreasonable but rather when it is "*ridiculously* unreasonable, unsound, or incongruous" (emphasis added), *Webster's Third New International Dictionary* 8 (2002) (defining

"absurd"). Second, the word "manifest" requires that any absurdity in contract language be *obvious*. *See Webster's Third New International Dictionary* at 1375 (defining "manifest" to mean "easily understood or recognized at once by the mind * * * : OBVIOUS"); *see also Black's Law Dictionary* 1107 (10th Ed.2014) (defining "manifest injustice" as "[a] *direct, obvious, and observable* error in a trial court" (emphasis added)); *id.* at 660 (defining "manifest error" as "[a]n error that is *plain and indisputable*" (emphasis added)). The Eighth District failed to acknowledge the narrow scope of the manifest-absurdity exception to the plain-meaning rule.

{¶ 21} The Eighth District also erred in its application of the exception. It determined that the plain language of the Rents Credit resulted in a manifest absurdity based on two factors. First, it believed that if the Rents Credit is interpreted to include all rent payments, it would be absurd for the parties to reduce the purchase price by *both* the Reduction in Principal Credit and the Rents Credit "during what could be a lengthy lease term." 2017-Ohio-7090 at ¶ 9. As an example, the Eighth District observed that, although the initial term of the lease was 10½ years, the Lease Agreement permitted two five-year extensions, meaning the lease could potentially continue for up to 20½ years. If the lease remained in effect for that full period, then under Beverage Holdings's interpretation, the court stated that it "would not only acquire the property" at the end of the lease but because the Rents Credit would have grown enormously over the lease period, Beverage Holdings "would also be owed money at closing—all the while enjoying the profits from operating the business." *Id.* Second, the Eighth District stated that the Real Estate Purchase Agreement provides for a closing period of between 120 and 180 days, which it believed "indicates that the [proration provision in the Rents Credit] was meant to apply only to rent paid after Beverage Holdings gave notice of intent to close." *Id.* at ¶ 10.

{¶ 22} When considered with the standard for "manifest absurdity" described above in mind, neither of these rationales supports a finding that the contract language at issue here is absurd, much less *obviously* absurd.

{¶ 23} Contrary to the Eighth District's first concern, we see no manifest absurdity in the Rents Credit including all rent payments made during a potentially "lengthy lease term." Beverage Holdings argues that the rent payments are properly understood as prepayments of the purchase price. The growth in the Rents Credit over time therefore would not reduce the overall amount of money received by Lombardo for the sale of the property, because the reduction in the purchase price due to the Rents Credit would be matched dollar-for-dollar by the rent payments received by Lombardo. As noted above, Lombardo also received the benefit of completing the sale in the near future with Beverage Holdings agreeing to pay the early-termination penalty to one of Lombardo's lenders—a payment Lombardo otherwise would have been required to make in order to complete the transaction before February 15, 2018, and that offset the credits from the perspective of Beverage Holdings. Finally, if the lease were to last long enough for the credits to add up to the initial purchase price of $1,726,000, Beverage Holdings could easily avoid the overpayment situation envisioned by the Eighth District by providing notice of its intent to close the transaction before that occurs. We therefore reject the conclusion of the Eighth District that the inclusion of the Rents Credit and the Reduction in Principal Credit in a potentially lengthy lease supports a finding of a manifest absurdity. *See Alexander*, 53 Ohio St.2d at 246, 374 N.E.2d 146 (finding no absurdity where extreme result theoretically permitted by plain language would reasonably be expected not to occur).

{¶ 24} We similarly see no manifest absurdity in the second concern raised by the Eighth District. It is true that the Real Estate Purchase Agreement allowed the closing to occur several months after Beverage Holdings provided notice of its intent to close the transaction, but nothing in the language of the provision

10

addressing the time for closing alters the plain language of the Rents Credit or otherwise provides a basis for interpreting the Rents Credit in the manner sought by Lombardo.

{¶ 25} Putting aside the rationales relied on by the Eighth District, we see no other basis on which to conclude that the plain language of the Rents Credit results in a manifest absurdity. The parties are sophisticated entities and were represented by counsel. Together they agreed to a unique transaction in which the purchase price would be reduced over time due to the application of various accumulating credits. To the extent Lombardo may be dissatisfied with the purchase price that resulted from the plain language agreed to by the parties, "[i]t is not the responsibility or function of this court to rewrite the parties' contract in order to provide for a more equitable result." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 362, 678 N.E.2d 519 (1997); *see also Natl. Union Fire Ins. Co. of Pittsburgh, Pa. v. Circle, Inc.*, 915 F.2d 986, 991 (5th Cir.1990) ("Although a business decision may be unwise, imprudent, risky, or speculative, it is not necessarily 'absurd.' We decline to allow contracting parties to escape the unfortunate and unexpected, though not objectively 'absurd,' consequences of a contract by subsequently characterizing their consequences as 'absurd' ").

### III. Conclusion

{¶ 26} For these reasons, we reverse the judgment of the Eighth District Court of Appeals and reinstate the judgment of the trial court.

Judgment reversed.

FRENCH, FISCHER, DONNELLY, and SCHAFER, JJ., concur.

KENNEDY, J., dissents, with an opinion.

DEWINE, J., dissents, with an opinion.

JULIE A. SCHAFER, J., of the Ninth District Court of Appeals, sitting for STEWART, J.

_____

**KENNEDY, J., dissenting.**

{¶ 27} I agree with the majority that "[i]t is not the responsibility or function of this court to rewrite the parties' contract in order to provide for a more equitable result." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 362, 678 N.E.2d 519 (1997). It *is* our responsibility, however, "to discover and effectuate the intent of the parties" when we construe a contract. *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996), citing *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974), paragraph one of the syllabus. Here, the majority addresses whether a certain reading of the contract is manifestly absurd. But the problem is that the majority, like the appellate court, misinterprets the contract. The contract doesn't say what the majority says it says, and therefore, the majority's discussion regarding whether the contract is manifestly absurd under its reading is irrelevant. Section 3(a)(ii), the "Rents Credit" clause of the Real Estate Purchase Agreement ("Purchase Agreement"), does not credit the appellant, Beverage Holdings, L.L.C., with all the rents that have been paid since the signing of the Purchase Agreement; instead, pursuant to the Rents Credit clause, the prepaid rent for the last month of the lease is distributed proportionately to the owners—the buyer and the seller—based on the dates of ownership determined by the closing date. That is, the owner of the property before the closing receives the proportionate share of the rent that covers the dates before the closing and the owner after the closing takes the part of the rent that covers the remainder of the month after the closing.

{¶ 28} The first proposition of law set forth by Beverage Holdings is "Courts cannot disregard unambiguous contract terms by deciding that they could lead to an absurd result under hypothetical circumstances." I would hold that that proposition of law is true, but contrary to the argument of Beverage Holdings, I would hold that the unambiguous contract terms require judgment in favor of the

12

appellee, 5701 Lombardo, L.L.C.  Because this case is resolved by addressing the first proposition of law, I would decline to address the four remaining propositions of law.  I would affirm the court of appeals' reversal of the trial court on other grounds and would remand the case to the trial court to enter judgment for the appellee.  Accordingly, I dissent.

{¶ 29} The contract at issue in this case is the Purchase Agreement between Beverage Holdings and Valentino-VAV, L.L.C., specifically Section 3 of the agreement, titled "Adjustments to Purchase Price."  The majority opinion does not set forth the language of the entire section.  Here is how it reads in the contract:

3.      ***Adjustments to Purchase Price***.  *At closing*, the purchase price shall be adjusted by providing Buyer a credit for the following:

a) The Purchase Price shall be decreased by:

i) All general taxes and assessments which are a lien on the property at closing and which are not paid at closing.

ii) *Rents received by Seller from the tenant of the Premises, prorated to date of closing*.

iii) Any security deposit held by Seller from the tenant occupying the property.

iv) The Reduction in Principal Credit.

v) Any indebtedness of Seller assumed by Buyer

b) The purchase price shall be increased and Buyers shall be responsible to pay an additional amount equal to the Credit-Swap Differential.

(Emphasis added.)

{¶ 30} The specific term in dispute is Section 3(a)(ii), which grants the purchaser "Rents received by Seller from the tenant of the Premises, prorated to date of closing." The majority says, "The language is broad and clear, providing that a credit would be provided for all 'rents' paid and that the credit would be prorated to the date of closing." Majority opinion at ¶ 16. But the language does not say or mean what the majority thinks it says or means.

{¶ 31} First, Section 3(a)(ii) does not use the word "all." That word is assuredly missing from the clause. Every rent payment is not part of the credit; the credit includes only those rents that the seller receives from the tenant that are prorated to the date of closing. The significance of the word "prorated" is discussed below.

{¶ 32} Second, the fact that "rents" is plural does not necessarily mean that the credit is for multiple months. We need to look to the Lease Agreement executed the same day as the Purchase Agreement; "[a]s a general rule of construction, a court may construe multiple documents together if they concern the same transaction." *Ctr. Ridge Ganley, Inc. v. Stinn*, 31 Ohio St.3d 310, 314, 511 N.E.2d 106 (1987). The Lease Agreement addresses different *types* of rent. Leases can include clauses that call for "additional rent" to be paid, a charge for instance, for the reasonable cost of operating and maintaining common areas. *See, e.g.*, *Ohio Forms & Transactions*, Section 18:19 (2019). The lease in this case contains the statement, in Section 4, "Any other sums payable to Lessor under this Lease shall be deemed to be additional rent." And the lease specifically addresses at least one "additional rent":

> For each Lease Year during the Term, Lessee shall pay Lessor, *as additional rent on a monthly basis*, one-twelfth (1/12th) Real Property Taxes assessed against the Premises annually as such taxes become due and payable during the Lease Term, prorated for *any*

14

partial assessment period occurring immediately before the Rent Commencement Date and after the Expiration Date.

(Emphasis added.)   Therefore, the presence of more than one type of rent in the Lease Agreement accounts for the use of the word "rents" in the Purchase Agreement.   Moreover, it makes sense under the Purchase Agreement that the prepaid portion of the real-estate taxes paid on the first of each month would be prorated such that the purchaser gains the benefit of that payment when it becomes the owner of the property.   That is, this "additional rent" would be prorated like the monthly rent for the premises.

{¶ 33} Third, the majority's interpretation of Section 3(a)(ii) renders the word "prorated" meaningless.   "When interpreting a contract, we will presume that words are used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary." *Wohl v. Swinney*, 118 Ohio St.3d 277, 2008-Ohio-2334, 888 N.E.2d 1062, ¶ 22.   To prorate is to "divide, assess, or distribute proportionately." *Black's Law Dictionary* 1340 (9th Ed.2009).   There was only one thing under the Rents Credit clause that would require proration, that would require a proportionate division: the prepaid rents for the one month during which the buyer and the seller each owned the property for a separate part of the month.   The Rents Credit clause controls the seller as well as the buyer.   Each gets a proportionate share.   Under the majority's interpretation of the contract, there is nothing to be divided proportionately.   If the buyer is receiving as a credit all the rents received by the seller, then proration is unnecessary—the buyer simply receives credit for all the rents that were paid.   A proration is meant to ensure that the entity with the burden of ownership gets the benefit of the rent.   For example, if the sale of a rental property closes on October 15, the seller gets the rents paid from October 1 to October 15, and the buyer gets the rent from October 16 through October 31.   The

use of "prorated" in Section 3(a)(ii) ensures that the last month's rent is distributed according to the periods of ownership.

{¶ 34} Lastly, the majority gives very little attention to the Reduction in Principal Credit clause in the contract. However, we must construe the contract as a whole, "and the intent of each part will be gathered from a consideration of the whole." *Foster Wheeler Enviresponse*, 78 Ohio St.3d at 361, 678 N.E.2d 519. In Section 3(a)(iv) of the Purchase Agreement, the buyer receives a credit for "The Reduction in Principal Credit." That credit is separately defined in Section 4 of the agreement:

> 4. ***Reduction in Principal Credit.*** Due to the current financing Seller has in place for the property; it is not practical to currently close this transaction. Because this transaction may not close for several years, Seller agrees to reduce the purchase price to Buyers by the amount of principal payments made by Seller to Seller's lender for the mortgage notes currently on the property. Therefore, at closing, Buyers will receive a credit equal to the reduction in principal for the mortgage notes from the date of the execution of this agreement until the closing date (The Reduction in Principal Credit).

{¶ 35} The Reduction in Principal Credit already provides a credit to the buyer for a portion of the rents paid from the execution of the Purchase Agreement through the closing; this is where the seller recognizes through the granting of a credit that an affiliate of the buyer has paid down the principal of the mortgage notes on the property through long-term rental payments. Therefore, credits to the buyer for *all* rents paid under the Lease Agreement would be redundant. The buyer would be getting a credit for the amount the principal was reduced through the

payment of rents under Section 3(a)(iv) as well as a complete credit for all rents paid under Section 3(a)(ii). Therefore, the buyer would be credited twice for the amount paid toward reducing the principal—once through the Reduction in Principal Credit and then again through the Rents Credit as the majority reads it. If the buyer already got credit for all rents paid under Section 3(a)(ii), why would it receive another credit for a portion of rents paid under Section 3(a)(iv)?

{¶ 36} The majority's interpretation of the contract is unreasonable. To get where it ends up, the majority adds the word "all," ignores the meaning of the word "prorated," and fails to recognize any significance of the Reduction in Principal Credit clause. We need only follow our rules of contract interpretation to properly resolve this case:

> When confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties. We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, we will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11.

*Sunoco, Inc. (R & M) v. Toledo Edison Co.,* 129 Ohio St.3d 397, 2011-Ohio-2720, 953 N.E.2d 285, ¶ 37.

{¶ 37} There is only one reasonable interpretation of the contract in this case. Again, the crux of the case is Section 3(a)(ii) of the Purchase Agreement, through which the buyer is credited with "Rents received by Seller from the tenant of the Premises, prorated to date of closing." When it sets forth this phrase in its opinion, the majority substitutes "Lombardo" for "Seller," which is unimportant, but also substitutes "Beverage Holdings" for "tenant." The tenant, however, is not Beverage Holdings; it is PRB Development, L.L.C., the affiliate of Beverage Holdings that was running the Goddard School at the property. And the use of the word "tenant" is important to consider. The reasonable interpretation of Section 3(a)(ii) is that Lombardo was selling a building that had a tenant and the parties had to address what would happen to payments from the tenant occupying the building. The clause at issue speaks of the "[r]ents received by Seller from the *tenant* of the Premises." (Emphasis added.) An Ohio treatise discusses the prorating of prepaid rent in a sale subject to tenancies:

At the time of conveyance and transfer of possession to purchaser, all rentals from property prepaid beyond the transfer date will be prorated between seller and purchaser as of that date. All rentals after that date falling due will be the sole property of purchaser.

*Ohio Forms Legal & Business*, Section 1:186 (2019). Therefore, the clause at issue recites a common clause included in sales of property that include tenancies. Since rent is prepaid under the lease—$12,500 rent is paid on the first of each month—it follows that the Purchase Agreement would account for the portion of the monthly payment that applies to the days remaining in the month after the closing of the sale. That prorated portion of the rent would go to the purchaser, who is the new owner of the property.

{¶ 38} Another clause in Section 3 also addresses the fact that the transfer involves property that includes a tenant under a lease. Section 3(a)(iii) credits to the buyer "[a]ny security deposit held by Seller from the tenant occupying the property." As the new landlord, the buyer takes the whole of the security deposit and theoretically returns that amount less deductions to the tenant at the conclusion of the lease.

{¶ 39} The only reasonable interpretation of the Purchase Agreement is that Section 3(a)(ii) and Section 3(a)(iii) were designed to address the issues that any transfer of property that involves a tenant under a lease would address—how to distribute the last month of prepaid rent when the closing doesn't fall on the last day of the month and what to do with the security deposit. Section(3)(a)(iv) is the term unique to this agreement and how the buyer in this case gets credit for the benefit the seller received from the long-term lease payments. That clause gets its own explanatory paragraph in Section 4 of the Purchase Agreement.

{¶ 40} I agree with the appellant's first proposition of law, that "[c]ourts cannot disregard unambiguous contract terms by deciding that they could lead to an absurd result under hypothetical circumstances." But I would hold that the unambiguous language of the contract should be interpreted differently from the interpretation supported by the appellant. Section 3(a)(ii) of the Purchase Agreement says that the last month's rent paid by the tenant should be distributed proportionately between the buyer and the seller, as determined by the closing date. Therefore, I would remand the cause to the trial court for it to enter judgment in favor of the appellee.

––––––––––––––––

**DEWINE, J., dissenting.**

{¶ 41} The dispute here concerns a contract provision that reduces the purchase price of the property by the amount of "[r]ents received by Seller [i.e., appellee, 5701 Lombardo, L.L.C.,] from the tenant [i.e., an affiliate of appellant,

Beverage Holdings, L.L.C.] of the Premises, prorated to date of closing." Both the majority and the other dissent insist that this clause is unambiguous. The majority says the contract unambiguously favors Beverage Holdings's interpretation, entitling the company to a credit for all rents paid over the entire term of the lease. The other dissent says the contract unambiguously favors Lombardo's interpretation, providing Beverage Holdings a credit only for a portion of the last month's rent payment. Neither story is wholly satisfying. While both opinions identify contract terms that seemingly point in their direction, neither is able to account for terms that seem to go the other way. In my view, the contract reasonably admits of competing interpretations, each of which is equally plausible on the face of the contract. I would thus hold that the disputed provision is ambiguous and remand the matter to the trial court for it to consider extrinsic evidence.

{¶ 42} As a rule, "written contracts are usually enforced in accordance with the ordinary meaning of the language used in them and without recourse to evidence, beyond the contract itself, as to what the parties meant." *Beanstalk Group, Inc. v. AM Gen. Corp.*, 283 F.3d 856, 859 (7th Cir.2002). This "strong presumption" that we not look beyond the four corners of the contract "simplifies the litigation of contract disputes and, more important, protects contracting parties against being blindsided by evidence intended to contradict the deal that they thought they had graven in stone by using clear language." *Id.*

{¶ 43} Accordingly, it is the duty of the court to exhaust principles of contract interpretation before resorting to extrinsic evidence of the parties' intent. *See* 11 Lord, *Williston on Contracts*, Section 30:4 (4th Ed.2019); *CNH Indus. N.V. v. Reese*, __ U.S. __, 138 S. Ct. 761, 765, 200 L.Ed.2d 1 (2018). Using basic principles of interpretation, it will usually be the case that one interpretation of a contract is the most plausible, because competing interpretations strain ordinary usage or are at odds with the apparent structure or purpose of the contract read as a

whole. In such a case, the mere fact that a motivated attorney can formulate a competing interpretation that is arguably consistent with the text of a contractual provision doesn't mean that the contract is ambiguous.

{¶ 44} But here, the case turns on a provision that is, to say the least, underspecified, given the effect that it has on the terms of the deal between the parties. And looking to the broader context of the contract doesn't help to resolve the issue in favor of one or the other of the dueling interpretations offered. As both the majority and other dissent illustrate, each of the interpretations is an imperfect fit for the contractual language—both require modifying the contractual language in order to yield a wholly unambiguous statement of the parties' intent.

{¶ 45} Start with the majority. The majority states that the "language is broad and clear, providing that a credit would be provided for all 'rents' paid and that the credit would be prorated to the date of closing." Majority opinion at ¶ 16. The majority thus reads the disputed provision to mean *all* rents received by the seller from the tenant *over the entire course of the lease agreement*, prorated to the date of closing. At first blush, this reading would appear to make sense. If A enters into a contract for the purchase of 100 widgets from B and the contract states that "the widgets shall be delivered on March 15," the referent of "the widgets" is usually fairly understood to be all 100 widgets that are the subject of the transaction and not some subset thereof. Reading "the widgets" to encompass all the widgets seems right based on the broader structure and context of the contract.

{¶ 46} The majority assumes that something similar is happening here: that one can fairly infer that "rents received by Seller from the tenant" means *all* rents received. And if the contract had merely provided a credit for rents received by the seller from the tenant, without additional qualifying language, that might be the most logical reading of the contract. But as the other dissent points out, the majority's account struggles to make sense of the proration clause—"the purchase price shall be decreased by * * * [r]ents received by Seller * * * *prorated to date*

*of closing*." (Emphasis added.) Since rent is prepaid, if the buyer gets a credit for all rents received by the seller, then there is nothing left to prorate—the proration clause has no effect. The majority offers no real rationale for the inclusion of the provision. It says only that "the proration language in the Rents Credit makes clear that the credit is limited to the [date of closing.]" Majority opinion at ¶ 16. But that makes little sense. If, as the majority contends, there is a credit for all rents received, then the rent credit isn't prorated at all.

{¶ 47} So, to adopt the majority's view, we must necessarily conclude that the proration clause is without practical effect, that it is simply surplusage. The necessity to do so certainly counts against the majority's interpretation. But I do not believe it completely forecloses our adoption of that approach. As the United States Supreme Court has noted, a "preference for avoiding surplusage constructions is not absolute." *Lamie v. United States Trustee*, 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004). And in this case, the competing view of the contract offered by the other dissent also fails to satisfactorily account for the contractual provision at issue.

{¶ 48} The other dissent would read the disputed provision to mean *prepaid* rents received by the seller from the tenant *for the month of closing*, prorated to the date of closing. This reading has the advantage of allowing the proration clause to do something. But it is premised upon an inference about the narrow reach of the "rents received" clause that isn't apparent from the text alone. And the other dissent's supporting arguments fall short of yielding confidence that its interpretation is required.

{¶ 49} The other dissent struggles to get around the fact that the most natural reading of the plural "rents" is the one adopted by the majority—*all* rents received. It argues that the use of the plural "rents" could be explained by the fact that there are different types of rent—the monthly rent payment and the additional rent payment covering property taxes. But that just establishes that Lombardo's

interpretation is permissible, the use of the plural "rents" notwithstanding. It doesn't show that Lombardo's interpretation is correct.

{¶ 50} Second, the other dissent argues that giving Beverage Holdings a credit for both all rents paid under the lease agreement and for any reduction in principal would be "redundant." Dissenting opinion of Kennedy, J., at ¶ 35. But it is hard to see how "redundancy" is a relevant concept if we look simply at the purchase agreement. To see why, consider that there is no reason, in theory, why the parties could not have agreed to a credit equal to twice the reduction in principal or to twice the total rent payments. Given other conditions, that might even be a sensible deal for both parties—for instance, if both the monthly rent payment and the sale price were far above the actual market values. Based on the rent payments, the sale price of the property, the property's market value, and the date of closing, we could calculate an effective interest rate for the money transferred by the buyer to the seller prior to closing. That interest rate may be high, it may be low, or it may be quite reasonable. If under prevailing commercial norms that effective rate is too high or too low, that might count against a party's interpretation of the contract. But that is something that can be assessed only through extrinsic evidence. From the face of the contract, this court simply cannot tell. And it would be a mistake to rule out that sort of transaction by declaring the credits contemplated by the agreement to be redundant.

{¶ 51} So, we are left with two competing interpretations, either of which could be claimed to be permitted by the text but neither of which is an especially good fit for it. The ordinary rules of contract interpretation do not answer the question before us; instead, they point us in different directions. I would therefore find that the text of the contract is ambiguous. "[W]here a contract is ambiguous, parol evidence may be employed to resolve the ambiguity and ascertain the intention of the parties." *Illinois Controls, Inc. v. Langham*, 70 Ohio St.3d 512, 521, 639 N.E.2d 771 (1994). I would send the matter back to the trial court for it

to look to extrinsic evidence in order to determine the intent of the parties regarding the disputed rent-credit provision.

{¶ 52} So, like the court of appeals, and unlike the majority and the other dissent, I believe a remand for further proceedings is in order. But I believe that the court of appeals erred in finding that Beverage Holdings' interpretation was manifestly absurd. As the majority correctly points out, the court of appeals did not adequately respect the narrow scope of our manifest-absurdity doctrine. That doctrine should not be invoked to rescue a party from a harsh result of applying the clear meaning of a contract. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 362, 678 N.E.2d 519 (1997). Rather, it is appropriately applied only to interpretations that make the contract incoherent in some fundamental way—perhaps by requiring a party to do something that is functionally impossible or by yielding nonsense.

{¶ 53} Here, there is nothing manifestly absurd about Beverage Holdings's interpretation. As I have explained, whether Beverage Holdings's interpretation of the contract is even a bad deal for Lombardo depends on what additional assumptions one makes about the market rental and sale value of the property. Indeed, this case illustrates the dangers of a court deploying the manifest-absurdity doctrine to protect against what it perceives to be a bad deal for one of the parties. Courts that get involved in assessing whether a contract is a bad deal can often be mistaken in that assessment. And, anyway, sometimes contracting parties make bad deals. The better course in deploying the manifest-absurdity doctrine is to stick with the face of the contract and ask whether a plain reading would render it fundamentally incoherent, such that no reasonable person would have agreed to it. Beverage Holdings's interpretation of the contract is certainly not fundamentally incoherent in a way that would legitimate invoking the manifest-absurdity exception to the plain-meaning rule. Thus, while I would remand the matter to the

trial court for it to look to extrinsic evidence to determine the parties' intent, I would do so without any presumption that Beverage Holdings's interpretation is absurd.[3]

———————————

Polito Rodstrom Burke, L.L.P., Joseph T. Burke, and James D. Romer, for appellant.

DiCaudo, Pitchford & Yoder, L.L.C., J. Reid Yoder, and Benjamin R. Sorber, for appellee.

Nee Law Firm, L.L.C., and Leigh S. Prugh, urging reversal for amicus curiae West Shore Bar Association.

Haddad Law Office and Tina R. Haddad, urging reversal for amici curiae Harlan D. Karp and Tina R. Haddad.

———————————

---

3. We accepted five propositions of law. The disposition of this case turns on the first proposition of law, which relates to the proper interpretation of the contract. Based on how I would resolve this case, propositions two through four are moot. In the fifth proposition of law, Beverage suggests that when parties are of equal bargaining power, ambiguities are construed against the drafter of the contract. But most courts today do not apply the principle that ambiguities are construed against the drafter to contracts negotiated by sophisticated commercial parties represented by counsel. *See Beanstalk*, 283 F.3d at 858. This court has not yet explicitly held that the principle has no application to such disputes. But it has also never held that it applies without first attempting to resolve the ambiguity through other means. Ohio courts routinely hold that to the extent that the principle of construing ambiguities against the drafter applies at all, it is a secondary rule of construction that comes into play only when an ambiguity remains after a court has looked to extrinsic evidence. *See Porterfield v. Bruner Land Co., Inc.*, 2017-Ohio-9045, 103 N.E.3d 152, ¶ 19 (7th Dist.); *Cline v. Rose*, 96 Ohio App.3d 611, 615, 645 N.E.2d 806 (3d Dist.1994); *Malcuit v. Equity Oil & Gas Funds, Inc.*, 81 Ohio App.3d 236, 240, 610 N.E.2d 1044 (9th Dist.1992).