[Cite as *EAP Ohio, L.L.C. v. Sunnydale Farms, L.L.C.*, 2024-Ohio-4522.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
CARROLL COUNTY

EAP OHIO, LLC,

Plaintiff-Appellee,

v.

SUNNYDALE FARMS, LLC et al.,

Defendants-Appellants.

---

**OPINION AND JUDGMENT ENTRY**
**Case Nos. 24 CA 0974, 24 CA 0975**

---

Civil Appeal from the
Court of Common Pleas of Carroll County, Ohio
Case No. 2021 CVH 29843

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Reversed and Remanded.

---

*Atty. Timothy B. McGranor, Atty. Gregory D. Russell, Atty. Ilya Batikov* and *Atty. Margaret S. Echols,* Vorys, Sater, Seymour and Pease LLP for Plaintiff-Appellee and

*Atty. Scott M. Zurakowski, Atty. Matthew W. Onest*, Krugliak, Wilkins, Griffiths & Dougherty Co. L.P.A. for Sunnydale Farms, LLC,et al. and *Atty. Andrew P. Lycans* for Stiltstone Resources, LLC.

Dated: September 11, 2024

**Robb, P.J.**

{¶1}  This case involves the interpretation of the royalty provision in the parties' oil and gas lease agreements.  Appellants, Sunnydale Farms, LLC, et al., and Siltstone Resources, LLC, appeal the January 2024 judgment granting Appellee, EAP Ohio, LLC (EAP), summary judgment on its complaint and on all counts of Appellants' counterclaims against it.  The parties disagree about the costs Appellee was authorized to deduct from Appellants' royalty payments.

{¶2}  We conclude there is a genuine issue of material fact regarding the meaning of certain lease terms.  Accordingly, we reverse and remand for further proceedings.

<u>Statement of the Facts and Case</u>

{¶3}  Appellee, EAP Ohio, LLC filed a complaint for declaratory judgment against Sunnydale Farms, LLC, Siltstone Resources, LLC, Douglas Rapp, Wendy Rapp, Smith Evergreen Nursery, Inc., James S. Smith, Constance A. Smith, D. Michael Smith, Melissa J. Smith, Marhefka Family Limited Partnership, Terry E. Cain, Co-Trustee of the Terry E. Cain and Doris L. Cain Revocable Living Trust, Doris L. Cain, Co-Trustee of the Terry E. Cain and Doris L. Cain Revocable Living Trust, Elaine Oelker, Watkins Family Limited Partnership, Craig J. Steigerwald, Co-Trustee of the Mary Ann Steigerwald Revocable Trust, Susan E. Mattix, Co-Trustee of the Mary Ann Steigerwald Revocable Trust, Craig J. Steigerwald, Kelly S. Pore, Janet Barclay, Lee T. Barclay, Susan E. Mattix, Frederick F. Mattix, Jr., and Michael Steigerwald in Harrison County in July of 2021.  The case was transferred to Carroll County.

{¶4}  Appellee's complaint alleges it is the current lessee of oil and gas leases with the defendants.  Appellee attached 13 leases as exhibits to its complaint under which it is the lessee pursuant to an assignment of the lease rights from Chesapeake Exploration, LLC.  Appellee asked the trial court to declare that pursuant to the common royalty provision in each lease, it is entitled to deduct its expenses for gathering, trucking, and fuel as "transportation" and "compression" expenses when calculating royalties due and owed to the defendants.  The Appellants/defendants are the lessors and/or the interest holders of the royalties detailed in the respective leases.

<u>Case Nos. 24 CA 0974, 24 CA 0975</u>

{¶5}   All of the defendants, except Siltstone Resources, LLC, filed a joint answer and counterclaim against EAP Operating, LLC, and Encino Acquisition Partner Holdings, LLC.  The Sunnydale defendants contend EAP deducted several post-production costs from their royalty payments in contravention to the uniform royalty clauses in their applicable leases.  The Sunnydale defendants alleged breach of contract and sought declaratory judgment.  They claim the EAP's royalty statements show it was improperly reducing the royalty payments by removing costs incurred for processing, treating, fuel, gathering, and trucking.  (July 29, 2021 Answer, Counterclaim & Third-Party Complaint.)

{¶6}   Siltstone Resources, LLC filed a separate answer and counterclaim against EAP Holdings, LLC, EAP Operating, LLC, Encino Acquisition Partner Holdings, LLC, and Encino Energy, LLC.  Siltstone alleged breach of contract and sought declaratory judgment.  It asked the court to find that EAP was improperly reducing its royalty payments by deducting post-production costs it incurred contrary to the lease language.  (August 2, 2021 Siltstone Answer and Counterclaim.)

{¶7}   The parties filed competing motions for summary judgment.  The Sunnydale defendants argued in their motion that the parties' royalty clause requires Appellee to pay the lessors or landowners the gross price Appellee received for the sale minus Appellee's expenses for transportation, compression, or dehydration incurred to deliver gas for sale.  Siltstone joined in the Sunnydale defendants' motion.  They also argued the lease language does not permit Appellee to deduct its expenses incurred for gathering, trucking, and fuel from the landowners, royalties.  (October 30, 2023 Sunnydale MSJ.)

{¶8}   The oil and gas leases were originally between the landowners and Eric Petroleum Corporation (Eric) and were negotiated in 2008 and 2009.  (Bruce Brocker Depo. p. 31, 36-39, 43, 48-49.)  Eric drafted the leases.  (Brocker Depo. p. 6-11, 31, 43, 48-49.)

{¶9}   Eric later sold the right to drill into the deeper formations under these leases to Chesapeake Exploration (Chesapeake), and Chesapeake assigned its rights to Appellee.  (Brocker Depo. p. 54.)

{¶10}  Appellants argue the original contracting parties intended that the only expenses that may be deducted from the royalties are Appellants' prorated share of those items that are explicitly listed in the lease agreements, i.e., transportation, compression,

and dehydration to deliver the gas for sale. Appellants argued the lease language was unambiguous and Appellee breached the agreements by deducting gathering, trucking, and fuel expenses.

{¶11} In support of their argument, Appellants rely in part on a royalty statement offered during the deposition testimony of Betty Hammer to show that gathering, fuel, and trucking are separate items or expenses. Appellee issues Appellants regular royalty statements for the royalties paid under the leases. (Betty Hammer Depo. p. 31-34.) On the top of each page of the royalty statement there is a "Legend." The Legend has a column labeled "Deduct Codes." Hammer confirmed Appellee adopted these codes from its predecessor. She explained:

> When we acquired all of Chesapeake's Utica interest, in order to get all the data into our system we took all their data, their structured data, and moved it into our accounting system. And we made the decision to keep however designations, classifications they made and we continued that in our system.

(Hammer Depo. p. 31-35, Ex. 3.) Hammer likewise confirmed that the deduct codes Appellee currently uses are those it continued from Chesapeake and that these codes were used by Chesapeake.

{¶12} These deduct codes include: 01 Compression; 02 Dehydration; 03 Processing; 04 Treating; 05 Transportation; 07 Fuel; 10 Other; 11 Gathering; 15 Trucking; and PE Property Expense. (Hammer Depo. p. 31-38, Ex. 3.)

{¶13} Hammer said Appellee included "gathering, trucking, and fuel" as "subcategories of transportation and compression." She testified under objection to the following:

> [Question: H]ow did Encino arrive at the conclusion that trucking is a subcategory of transportation and compression as those terms are used in these leases?
>
> . . . Objection.
>
> [Answer:] It's just understood. I mean, trucks are transportation. Fuel is part of transportation.
>
> . . .

[Question:] How does trucking, the term "trucking" differ from transportation? Or are they one in the same?

[Answer:] It's . . . transportation. It's a type of transportation.

. . .

[Question:] Is it Encino's position that compression, transportation, and trucking are all the same thing?

. . .

[Answer:] I think they're related and I guess I don't know.

(Hammer Depo. p. 36-38.)

{¶14} Hammer was then asked about a code guide she created. The version introduced at her deposition was created in March of 2021, and she agreed she emailed it to everyone who worked for her at the time. The code guide states: "[f]or each lease, you must first make . . . a determination of whether the lease is . . . Gross, net, [or] limited deductions allowed." Hammer then explained that gross leases in this context are "ones where no deductions can be taken." Net leases in this context are leases in which "all deductions can be taken." And "limited deductions allowed" leases are "leases that only allowed certain deductions, like only compression, transportation type, . . . or . . . processing. And so that would be a limited deduction [lease]." (Hammer Depo. p. 68.)

{¶15} Hammer agreed that one version of the accounting software Appellant uses had this "Eric Petroleum lease" listed as "Only compression, transportation, gathering, and dehydrating deducts allowed." Hammer said this version of their coding order did not list trucking or fuel as allowable deductions. However, according to her, a newer version does include trucking and fuel as allowable deductions. (Hammer Depo. p. 71-72.)

{¶16} She agreed that the deduction coding guide offered during her deposition does not "reference that gathering, trucking or fuel are subcategories of transportation or compression . . ." She created the guide to breakdown the different types of deductions to mirror the company's accounting system. The guide indicates it was meant "to assist with coding leases with respect to post-production costs using current interpretations." (Hammer Depo. p.78-79.)

{¶17} The deduction coding guide also states "these interpretations may change to reflect new case law." The guide is a "fluid document" that is "always evolving."

Case Nos. 24 CA 0974, 24 CA 0975

Regarding the lease language at issue here, the guide states in part, "Eric Petroleum leases often limit the allowed deductions to transportation, compression, and dehydration. Gathering is also included as an allowed deduction . . . since it is considered a transportation-type deduction." (Hammer Depo. p. 73-81.) In making this directive in the guide, she said she relied on "our company's position based on what the current understanding is." (Hammer Depo. p. 84.)

**{¶18}** Appellants also rely on Bruce Brocker's testimony in support of their argument. Brocker testified that his company, Eric Petroleum Company, added the term "transportation" as a deduction from royalties to cover the situation where it sold the gas directly to the end user and had to use gas marketers to get the gas through interstate pipelines. The term was meant to cover those costs. (Brocker Depo. p. 16-17.) According to Brocker, Appellee did not meet with any Eric company representatives to discuss how to calculate the royalties under the lease agreements. (Brocker Depo. 56.)

**{¶19}** In the alternative, Appellants argued the lease agreement language was ambiguous and must be construed against Appellee. (October 30, 2023 Sunnydale MSJ.)

**{¶20}** Appellee also moved for summary judgment on its complaint and on the defendants' counterclaims. It argued the parties' competing claims are mutually determinative and the lease language is unambiguous and permits Appellees to deduct gathering, fuel, and trucking costs. Appellee argued that gathering is a form of transportation.

**{¶21}** Appellee also argued that the granting clause gives it the authority to "transport by pipelines or otherwise across and through said lands oil, gas and their constituents from the subject and other lands, regardless of the source of such gas or the location of the wells, which right to transport gas from other properties across the leasehold premises shall survive the term of this lease for so long as the transportation of such gas may be desired by the Lessee." Appellee claims the authority granted in this clause defines the term transportation and thus gives it the right to deduct these charges from the royalty payments.

**{¶22}** In support, Appellee offered the deposition testimony of Jason Brunsell. According to Brunsell, senior director of midstream at Encino, the gathering charges Appellee charged Appellants were incurred to get the gas to the processing plant. He

said gathering is the collection of gas at the wellhead and transporting it to the next point, usually the processing plant. Appellee does not do its own gathering. He also said compression is often a component of the gathering service. (Jason Brunsell Depo. p. 17).

**{¶23}** Brunsell also described how Appellee incurs fuel charges. He said midstream providers bill Appellee the fuel charges these companies pay. The charges are the "fuel and electricity associated with the gathering, . . . fractionation and processing of the gas." (Brunsell Depo. p. 33-34.).

**{¶24}** Alternatively, Appellee asserted that if the court found the lease language ambiguous, extrinsic evidence demonstrates it was permitted to deduct gathering, fuel, and trucking costs as transportation expenses. Appellee offered an affidavit and expert report detailing the natural gas production chain. Appellee's expert report goes into significant detail and offers his opinion on the issues before the court. He concludes "gathering is transportation" and "trucking is transportation." (October 30, 2023 EAP's Motion for Summary Judgments, Ex. 4 Affidavit and Report of R. David Vinson.)

**{¶25}** Regarding the oil clause, Appellee claims the leases set the valuation point on oil as the delivery point into tanks or pipelines. Appellee contends this language requires Appellants' royalties to be calculated at the wellhead, and thus, after the deduction of post-production costs.

**{¶26}** The parties filed joint stipulation of facts in which they agreed that the defendants are comprised of both original lessors and successor lessors. The parties also stipulated that EAP is the successor lessee in interest to the oil and gas leases attached to EAP's July 2021 complaint and marked as exhibits 1-13. They agreed the original lessee for each agreement was Eric Petroleum Corporation and that the leases were assigned to EAP from Chesapeake Exploration. Among other things, the parties agreed that each of the leases contain identical "terms and obligations with respect to the calculation and payment of royalties." (Joint Stipulation of Facts.)

**{¶27}** The parties also stipulated that "[e]xcept as may be printed in the Leases' printed text, Defendants have no personal knowledge about or subjective understanding of the lease terms." They further agreed, "[e]xcept as may be printed in the Leases' printed text, Defendants have no personal knowledge as to Eric Petroleum's understanding of the [disputed lease terms], except as to deposition testimony of Eric

Petroleum provided in this case." The parties likewise agreed the "Defendants have no formal education, formal vocational, or work experience in the field of oil and gas, including the movement of oil and gas from the well to the point of sale." (Joint Stipulation of Facts.)

<u>Oil & Gas Lease Agreement</u>

**{¶28}** The oil and gas leases at issue here identify the landowner or the interest holders of the royalties as the Lessor and Eric Petroleum Corporation as the Lessee. The common lease language granting the oil and gas rights to Appellee's successor ("the grant clause") states in part:

1. That the Lessor, for and in consideration of one dollar . . . does hereby lease and let exclusively unto the Lessee, for the purpose of drilling, operation for, producing and removing oil and gas and all the constituents thereof, . . . and to *transport by pipelines or otherwise across and through said lands oil, gas and their constituents from the subject and other lands*, regardless of the source of such gas or the location of the wells, *which right to transport gas from other properties across the leasehold premises shall survive the term of this lease* for so long as the transportation of such gas may be desired by the Lessee, and of the placing of tanks, equipment, roads and structures hereon to procure and operate for the said products, together with the right to enter into and upon the leased premises at all times for the aforesaid purposes.

(Emphasis added.)

**{¶29}** The common lease language setting forth the royalty provisions is comprised of subsection A, governing oil royalties, and subsection B, governing gas royalties. These provisions state:

4. In consideration of the premises the Lessee covenants and agrees:

(A) To deliver to the credit of the Lessor in tanks or pipelines, as royalty, free of cost, the equal one-eighth (1/8) part of all oil produced and saved from the premises, or at Lessee's option to pay Lessor the market price for such one-eighth (1/8) royalty oil at the published rate for oil of like

<u>Case Nos. 24 CA 0974, 24 CA 0975</u>

grade and gravity prevailing on the date such oil is run into tanks or pipelines.

(B) To pay to the Lessor, as royalty for the gas marketed and used off the premises and produced from each well drilled thereon, the sum of one-eighth (1/8) of such gas so marketed and used at the price paid to Lessee per thousand cubic feet, measured in accordance with Boyle's Law for the measurement of gas at varying pressures, on the basis of 10 ounces above 14.73 pounds atmospheric pressure, at a standard base temperature of 60 degrees Fahrenheit without allowance for temperature and barometric variations *less any charges for transportation, compression and/or dehydration to deliver the gas for sale*. Payment of royalty for gas marketed during any calendar month to be on or about the 30th day after receipt of such funds by Lessee.

(C) Lessee to deduct from payments in (A) and (B) above from receipts of proceeds by Lessee, Lessor's pro rata share of any tax imposed by any government body.

. . .

19. All covenants and conditions between the parties shall extend to their heirs, personal representatives, successors and assigns . . . It is mutually agreed that this instrument contains and expresses all of the agreements and understandings of the parties in regard to the subject matter thereof and no implied covenant, agreement or obligation shall be read into this agreement or imposed upon the parties or either of them. . . .

(Emphasis added.) (EAP's Summary Judgment Motion, Ex. 1, November 17, 2009 Oil and Gas Lease.)

### Trial Court Decision

{¶30} As stated, the trial court found in Appellee's favor on its declaratory judgment claim and against Appellants on all claims. The trial court found the lease language unambiguous and concluded the lease authorizes Appellee to charge the Appellants for their proportionate share of costs for gathering, trucking, and fuel and these items were encompassed by the term "transportation." It explained:

Case Nos. 24 CA 0974, 24 CA 0975

10. EAP Ohio produces and sells oil and gas/condensate pursuant to the Leases and pays Defendants royalties on those sales.

11. EAP Ohio calculates Defendants' royalties by allocating the revenues that it receives from the sale of gas and oil/condensate under the Leases against the post-production charges that EAP incurs from third-party midstream providers for gathering, trucking, and fuel.

. . .

13. This Court finds that the Leases permit EAP Ohio to charge Defendants for their proportionate share of post-production costs for gathering, trucking, and fuel.

. . .

28. . . . [T]he Court finds that the Leases' plain language permits EAP to pay Defendants royalties "less any charges for transportation," including transportation associated with gas gathering.

29. Although extrinsic evidence is unnecessary for determining the plain meaning of the Leases, the Court nevertheless finds that the extrinsic evidence presented here corroborates that "transportation" includes "gathering" within the understanding of the oil and gas industry.

30. As EAP Ohio representative Jason Brunsell explained, gathering is "the *transportation* of wellhead gas from the pad . . . to the next point" in the transportation chain, which is either to "another gathering system" or a "gas processing plant."  (Jason Brunsell Dep. at 17:3-4 (emphasis added [by the trial court.]).)

31. Similarly, EAP Ohio's expert David Vinson explained, gathering is "the *transportation* of gas via smaller diameter pipelines from the wellhead meters directly to central processing or delivery facilities; or 2) the *transportation* of gas from the wellheads to metered central delivery points or CDPs, as well as the further transportation of gas from metered CDPs to central facilities such as gas compression stations or gas processing plants, or for delivery directly into transmission pipelines."  (EAP Ohio Mot. Summ. J. at Ex. 4, Vinson Report at 6 (emphasis added [by the trial court.]).)

. . .

34. Defendants concede that under Lease paragraph 1, "[EAP Ohio] can gather [Defendants'] gas with other landowners' gas." (Defs.' Opp. at 15.) Nonetheless, they maintain that "[EAP Ohio] cannot charge [Defendants] with those gathering costs because the Royalty Clause does not list gathering as a category of permitted deductions." *Id.*

35. This Court disagrees. Nothing in the Leases' plain language suggests the parties meant anything different by the word "transportation" in the phrase "less any charges for transportation, compression and/or dehydration" in the Royalty Clause than when the same word was used in paragraph 1. . . .

. . .

36. The Leases permit EAP Ohio to charge Defendants for their proportionate costs of the charges that EAP Ohio incurs for fuel.

37. EAP Ohio's former Senior Director of Midstream Jason Brunsell testified that fuel charges were for fuel that midstream providers purchased and consumed in connection with gathering. Because gathering costs were appropriately deducted from the royalty payments as an act of "transportation," fuel costs associated with gathering are similarly deductible.

. . .

38. Next, Defendants contend that even if this Court finds that "transportation" in the Lease encompasses gathering and fuel, Defendants still prevail because EAP does not incur gathering and fuel charges "to deliver the gas for sale" as the Royalty Clause requires. This Court disagrees.

. . .

42. Defendants' reading also leads to nonsensical results when the phrase "less any charges for transportation, compression and/or dehydration to deliver the gas for sale," is read as a whole. Mr. Vinson's report explains that compression and dehydration occur at the stage in the

transportation chain coinciding with gathering. (EAP Ohio's MSJ Ex. 4, Expert Report of David Vinson at ¶ 14) (explaining that "[i]n a pipeline gathering system, the gas can be compressed by centralized compression equipment to increase gas pressure for more efficient transportation. It may be dehydrated to reduce water vapor . . .")

43. Thus, to restrict "transportation" to only the final movement of gas from a processing plant to the buyer would also require excluding compression and dehydration, even though these processes occur in conjunction with gathering and the parties expressly permitted compression and dehydration charges to be deducted "to deliver the gas for sale."

. . .

45. Last, Defendants dispute that the Leases permit EAP to deduct trucking costs. This Court disagrees. The trucking costs that EAP Ohio shares with Defendants are associated with the production of oil/condensate from the subject wells and reflect EAP Ohio's costs to third parties for transporting oil/condensate from tanks on the well site to a stabilization facility for treating and sale. The Leases obligate Defendants to share in these costs.

46. With respect to oil, the Royalty Clause states:

To deliver to the credit of the Lessor in tanks or pipelines, as royalty, free of cost, the equal one-eighth (1/8) part of all oil *produced and saved from the premises*, or at Lessee's option to pay Lessor the market price for such one-eighth (1/8) royalty oil at the published rate for oil of like grade and gravity prevailing on the date *such oil is run into tanks or pipelines*. (Leases, ¶ 4(A) (emphasis added [by the trial court]).)

47. The references in the royalty clause to "in tanks or pipelines" and "produced and saved on the premises" set the valuation point for the royalties on oil at the wellhead. Courts applying Ohio law have construed similar leases to allow producers to calculate royalties based on a "netback" method that subtracts post-production costs from the value of oil and gas

sold downstream to arrive at the value of the substances "at the well." *See Henceroth v. Chesapeake Expl., LLC*, 814 F. App'x 67 (6thCir.2020).

. . .

50. The Court finds . . . the "market price" that EAP Ohio owes is for oil/condensate at the physical spot where the oil is "run into tanks or pipelines," i.e., at the wellhead. This market price is determined under the netback method. *See Henceroth*, 814 F.App'x at 70 (explaining that the netback method is "nothing more than a method of determining *market value* at the well in the absence of comparable sales data at or near the wellhead.") (emphasis added [by the trial court]).

51. Any trucking charges to move the oil downstream away from tanks on the well pad for treatment further downstream must thus be netted back to arrive at the market price of the oil at the well.

52. The Court therefore finds that the Leases permit EAP Ohio to charge Defendants for their proportionate share of trucking costs.

(January 22, 2024 Judgment.)

**{¶31}** Thus, upon construing the lease terms collectively, the court found the term "transportation" was not ambiguous and includes costs for gathering and fuel. It also held EAP could deduct the cost of trucking associated with oil/condensate.

**{¶32}** The Sunnydale Defendants appealed, and Siltstone separately appealed the same judgment. We consolidated the appeals. Appellants collectively raise one assignment of error.

Assignment of Error

**{¶33}** Appellants' sole assigned error contends:

"The trial court erred in granting summary judgment to Appellee, EAP, Ohio, LLC on its claims and on Appellants' counterclaims."

**{¶34}** Appellants urge us to conclude the trial court erred by finding the royalty clauses unambiguous and granting summary judgment in EAP's favor. Appellants claim the contract provisions are unambiguous and summary judgment is instead warranted in their favor.

Case Nos. 24 CA 0974, 24 CA 0975

**{¶35}** Their sole assignment of error is comprised of several sub-arguments, most of which address the gas royalty clause set forth in Section 4(B) of the common lease agreements. They raise one argument about the court's decision regarding oil royalties.

**{¶36}** Appellants argue in the alternative that the clauses are ambiguous and thus reversal is required.

<u>Standard of Review & Contract Construction</u>

**{¶37}** Appellate review of summary judgment decisions is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).

**{¶38}** Pursuant to Civ.R. 56(C), summary judgment may only be granted when:

(1) No genuine issue as to any material fact remains to be litigated;
(2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

**{¶39}** Oil and gas leases are contracts subject to the rules of contract interpretation. *Lutz v. Chesapeake Appalachia, L.L.C.*, 2016-Ohio-7549, ¶ 11. "The rights and remedies of the parties to an oil and gas lease must be determined by the terms of the written instrument . . . Such leases are contracts, and the terms of the contract with the law applicable to such terms must govern the rights and remedies of the parties." *Swallie v. Rousenberg*, 2010-Ohio-4573, ¶ 61 (7th Dist.), quoting *Harris v. Ohio Oil Co.,* 57 Ohio St. 118 (1897).

**{¶40}** When construing a contract, a court's principle objective is to ascertain and give effect to the intent of the parties. *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.,* 86 Ohio St.3d 270, 273 (1999). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.,* 31 Ohio St.3d 130 (1987), paragraph one of the syllabus. Thus, where the terms of a contract are clear and unambiguous, a court cannot look beyond the plain language of the agreement to determine the rights and obligations of the parties. *Cocca Dev. v.*

*Mahoning Cty Bd. of Commrs.,* 2010-Ohio-3166, ¶ 26 (7th Dist.), citing *Aultman Hospital Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (1989).

**{¶41}** We must employ the plain meaning of the terms used, unless a manifestly absurd outcome results or if there is clear evidence of a different meaning when reviewing the agreement in total. *Alexander v. Buckeye Pipeline Co.,* 53 Ohio St.2d 241, 248 (1978); *Cooper Tire & Rubber Co. v. Warner Mechanical Corp.,* 2007-Ohio-1357, ¶ 10 (3d Dist.).

**{¶42}** "[A] writing * * * will be read as a whole, and the intent of each part will be gathered from a consideration of the whole." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 361 (1997). "Courts should attempt to harmonize provisions and words so that every word is given effect." *Christe v. GMS Mgt. Co.,* 124 Ohio App.3d 84, 88 (9th Dist.1997).

**{¶43}** With respect to oil and gas leases in particular, it is the long-held view in Ohio that "[t]erms in a contract are ambiguous if their meanings cannot be determined from reading the entire contract, or if they are reasonably susceptible to multiple interpretations." *Tera, LLC v. Rice Drilling D, LLC*, 2023-Ohio-273, ¶ 39 (7th Dist.), citing *First Natl. Bank of Pennsylvania v. Nader*, 2017-Ohio-1482 (9th Dist.).

> "To construe or interpret what is already plain is not interpretation" and is not our function when a writing is unambiguous. *Lake Hosp. Sys., Inc. v. Ohio Ins. Guar. Assn.*, 69 Ohio St.3d 521, 524, 634 N.E.2d 611 (1994), quoting *Iddings v. Bd. of Edn. of Jefferson Cty. School Dist.*, 155 Ohio St. 287, 290, 98 N.E.2d 827 (1951) (addressing statutory construction). Absent an ambiguity, courts must apply a contract "as written and conduct no further investigation." *State v. Hurd*, 89 Ohio St.3d 616, 2000-Ohio-2, 734 N.E.2d 365, citing *State ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 584, 651 N.E.2d 995 (1995) (addressing statutory language).

*G.A.I. Capital Group LLC v. Lisowski*, 2023-Ohio-4802, ¶ 31 (7th Dist.).

**{¶44}** The Ohio Supreme Court has repeatedly held that resolving the meaning of ambiguous contract terms is a matter for the factfinder, and the purpose of summary judgment is to ascertain whether triable issues of fact exist for the finder of fact. *Tera, LLC, supra,* at ¶ 19.

Case Nos. 24 CA 0974, 24 CA 0975

> If the court cannot decipher the plain language of the contract, then the fact-finder can consider extrinsic evidence to resolve the ambiguity and ascertain the parties' intent. . . . And, where the written contract is standardized and between parties of unequal bargaining power, any ambiguities are strictly construed against the drafter and in favor of the non-drafting party.

*Kenney v. Chesapeake*, 2015-Ohio-1278, ¶ 15 (7th Dist.), citing *Westfield Ins. Co. v. Galatis,* 2003-Ohio-5849, ¶ 11-13; *accord Sutton Bank v. Progressive Polymers, L.L.C.*, 2020-Ohio-5101, ¶ 15 (construing contract against the drafter is a secondary rule of construction employed when a contract is ambiguous).

## I.      GAS ROYALTY ARGUMENTS

**{¶45}** Appellants urge us to conclude that the gas royalty clause is unambiguous and must be applied as written.  They contend the trial court erred by adopting Appellee's assertions and concluding that transportation encompasses gathering and fuel costs.  In the alternative, Appellants assert the clause is ambiguous, and as such, a genuine issue of fact remains for the factfinder.

### A. Custom & Usage Evidence

**{¶46}** We address Appellants' argument about custom and usage evidence first. They assert the court erred in its reliance on the industry meaning of the lease term "transportation" because Appellants are not members of the oil and gas industry.  Second, Appellants argue that Appellee's expert did not identify an industry-wide understanding of what the term "transportation" means to lessors and lessees.  Thus, they claim reliance on this evidence was impermissible.  We agree.

**{¶47}** Courts are permitted to rely on extrinsic evidence to ascertain the parties' intent under two circumstances.  First is when the contractual language is unclear and ambiguous.  *Kenney v. Chesapeake*, *supra*, at ¶ 44 (7th Dist.).  The second context is when "the circumstances surrounding the agreement invest the language of the contract with a special meaning."  (Citations omitted.)  *Id.* at ¶ 44.

**{¶48}** The proponent of extrinsic custom and usage evidence has the burden of showing the other party to the contract knows or has reason to know of the usage of the challenged term.  *Beaverkettle Farms, Ltd. v. Chesapeake Appalachia, LLC*, 2013 WL

4679950, *15, (N.D.Ohio August 30, 2013), citing *Dana Partners, LLC v. Koivisto Constructors & Erectors,* 2012-Ohio-6294, ¶ 25-27 (11th Dist.), citing *Fidelity Mortgage Corp. v. Bruno,* 1981 WL 5370, *3 (2nd Dist.), quoting Restatement of Contracts 2d, Section 221 (1981).

**{¶49}** Evidence of custom or trade usage is permissible to show that contracting parties used terms that either have a special meaning within a certain geographic location or a particular trade or industry, even though that meaning is not reflected on the face of the agreement. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 248 (1978). Extrinsic evidence of custom or trade usage cannot vary the express terms of a contract. *Id.* If the custom or trade usage is established, a court can consider the extrinsic evidence without finding the contract language is ambiguous. *Tera II, LLC v. Rice Drilling D, LLC*, 679 F.Supp.3d 620, 649-50.

**{¶50}** As stated, the court found the parties' lease royalty provisions are unambiguous. Notwithstanding, the court still considered extrinsic evidence which bolstered the court's conclusion. It stated in part: "Mr. Vinson further opined that '[g]athering of natural gas and crude oil is understood in the oil and gas industry to be a transportation service.'" (January 22, 2024 Judgment ¶ 32.)

**{¶51}** The trial court did not state it considered Mr. Vinson's testimony as permissible summary judgment evidence or that his testimony satisfied the custom and usage exception. Notwithstanding, to the extent it considered it as permissible custom and usage evidence, we find error.

**{¶52}** The parties stipulated Appellants and their predecessors in interest had "no personal knowledge as to Eric Petroleum's understanding of the [disputed lease terms], except as to deposition testimony of Eric Petroleum provided in this case." The parties likewise agreed Appellants "have no formal education, formal vocational, or work experience in the field of oil and gas, including the movement of oil and gas from the well to the point of sale." (Joint Stipulation of Facts.)

> "Usages and customs of a particular trade are not binding on a party who is not a member of a particular trade but who has simply entered into an agreement with a member of a trade, unless such party has actual

knowledge of the usage or custom or has previously engaged in transactions in which the usage or custom was recognized."

*Lakewood Homes, Inc. v. BP Oil, Inc.*, 1999-Ohio-851, *4 (3rd Dist.), quoting 92 Ohio Jurisprudence 3d (1989), Usages and Customs, Section 28.

**{¶53}** To the extent the trial court relied on this testimony as summary judgment evidence, we find error since there is nothing to show Appellants had knowledge of the purported definition or that they were members of the oil and gas industry.

**{¶54}** Thus, we need not consider the second aspect of this argument, i.e., whether Appellee presented sufficient evidence of a widespread usage of the term in the oil and gas industries to support a valid presumption that these parties had knowledge of the special usage. *See Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 248 (1978). This aspect of Appellants' argument is moot.

### B. Reliance on Statutory and Administrative Code Definitions

**{¶55}** Appellants also claim the trial court erred by relying on the definitions set forth in R.C. 4905.90 since that provision does not apply to or govern oil and gas leases and is inapplicable. Appellants likewise argue the trial court erred by relying on the definition of "transportation of gas" set forth in OAC 4901:1-16-01(R) as inapplicable and not adopted by the contracting parties. We agree.

**{¶56}** A court construing a contract is generally limited to the four corners of the parties' agreement and should give common words their ordinary meaning "unless manifest absurdity results or unless some other meaning is clear from the face or overall contents of the agreement." (Citations omitted.) *Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 2019-Ohio-4716, ¶ 13. And upon concluding a writing is not ambiguous, courts should not generally resort to sources outside the agreement other than to provide terms their ordinary meaning. *Id.*

**{¶57}** However, "[t]echnical terms will be given their technical meaning, unless a different intention is clearly expressed. *Cincinnati Ins. Co. v. Duffield* (1856), 6 Ohio St. 200, paragraph one of the syllabus." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (1997).

**{¶58}** Here, however, the parties do not agree on the meaning of the terms "gathering" and "transportation." They referred the trial court to differing definitions.

**{¶59}** As alleged, the trial court relied on the definition of "gas gathering pipeline" set forth in R.C. 4905.90(D) to support its conclusion that the term "transportation" in the parties' lease includes expenses for gathering natural gas.

**{¶60}** R.C. 4905.90 sets forth definitions to be used in Sections 4905.90 to 4905.96 of the Revised Code, regarding natural gas line pipeline safety. R.C. 4905.90 reads in part:

> (D) "Gas gathering pipeline" means a gathering line that is not regulated under the Natural Gas Pipeline Safety Act and the rules adopted by the United States department of transportation pursuant to the Natural Gas Pipeline Safety Act, including 49 C.F.R. part 192, as amended. "Gas gathering pipeline" includes a pipeline used to collect and transport raw natural gas or transmission quality gas to the inlet of a gas processing plant, the inlet of a distribution system, or to a transmission line.

**{¶61}** The R.C. 4905.90 definitions were not adopted or referenced by the parties to the lease agreement. They likewise do not govern oil and gas leases, and as such, we agree the trial court erred by relying on them.

**{¶62}** Furthermore, the trial court explicitly relies on definitions in Ohio's Administrative Code for the definition of "transportation of gas." The parties did not adopt or reference the definition in OAC Adm.Code 4901:1-16-01(R), and as such, the court erred by considering it.

**{¶63}** Similarly, Appellants direct our attention to cases to support their argument that "gathering" is the collecting of natural gas from multiple wells and funneling it into a small intermediary pipeline. One case they cite explains:

> The expenses associated with bringing the oil to the surface are referred to as "production" costs. . . . After the gas is brought to the surface, it must be converted into a marketable condition so that it can move through the interstate pipeline and to the ultimate customer. Specifically, the gas must be purified into "pipeline quality" natural gas. These "post-production" processes, also referred to as "midstream services," usually include some combination of "gathering," "treating," "compression," and "processing."

Case Nos. 24 CA 0974, 24 CA 0975

"Gathering" refers to collecting the gas from multiple wells and funneling it into a small intermediary pipeline.

*Kovach v. Access Midstream Partners, L.P.*, 2016 WL 1162061, *1 (N.D. Ohio March 23, 2016.). The court in *Kovach* cites plaintiff's complaint as the source for these explanations. *Id.*

**{¶64}** Appellants also refer to *Northern Nat. Gas Co., Div. of Enron Corp. v. FERC*, 929 F.2d 1261, 1263-1265 (8th Cir.1991) for the definition of the terms gathering and transportation, stating: "[t]he term 'gathering' refers to the process of collecting gas at the point of production (the wellhead) and moving it to a collection point for further movement through a pipeline's principal transmission system." *Id.* Whereas, the "transportation" of natural gas occurs after the gathering is complete. *Id.* However, the court in *Northern* was defining and employing these terms upon analyzing U.S. Code Sections regulating natural gas companies and the Natural Gas Act.

**{¶65}** As stated, the leases do not set forth definitions and do not refer to outside sources. In fact, the parties' lease agreement states in part: "It is mutually agreed that this instrument contains and expresses all of the agreements and understandings of the parties . . ." (January 22, 2024 Judgment ¶ 19.)

**{¶66}** Thus, the court's reliance on Appellee's proffered definitions when faced with the parties' competing definitions of these terms was improper and constitutes error.

### C. Plain Language of the Lease

**{¶67}** The parties contest the plain meaning of the phrase "less any charges for transportation, compression and/or dehydration to deliver the gas for sale."

**{¶68}** Appellants argue paragraph 4(A) of the lease agreement requires Appellee to pay gas production royalties based on the price Appellee receives for the sale and that the lease only permits Appellee to deduct three post-production expenses, i.e., transportation, compression, and dehydration. Appellants claim the trial court improperly added the words "gathering" and "fuel" to the term transportation, contrary to the language of the contract.

**{¶69}** The section at issue states:

> 4. In consideration of the premises the Lessee covenants and agrees:
>
> . . .

(B) <u>To pay to the Lessor, as royalty for the gas</u> marketed and used off the premises and produced from each well drilled thereon, the sum of one-eighth (1/8) of such gas so marketed and used at the price paid to Lessee per thousand cubic feet, measured in accordance with Boyle's Law for the measurement of gas at varying pressures, on the basis of 10 ounces above 14.73 pounds atmospheric pressure, at a standard base temperature of 60 degrees Fahrenheit without allowance for temperature and barometric variations <u>less any charges for transportation, compression and/or dehydration to deliver the gas for sale</u>. Payment of royalty for gas marketed during any calendar month to be on or about the 30th day after receipt of such funds by Lessee.

(Emphasis added.)

**{¶70}** Appellants contend the trial court improperly rewrote the parties' agreement by broadly defining the term transportation to include the costs for gathering and fuel. They contend the trial court's interpretation essentially allows Appellee to deduct all of its costs and render the phrase "transportation, compression, and/or dehydration" meaningless such that any "transfer or conveyance" of gas constitutes transportation.

**{¶71}** The parties disagree about what the term "transportation" encompasses and whether the lessee is authorized to deduct all transportation charges from Appellants' royalty or only the transportation charges incurred "to deliver the gas for sale." The terms "transportation," "dehydration," and "compression" are not defined contract terms.

**{¶72}** They also disagree about whether gathering is a form of transportation and if it is a permissible deduction from Appellants' royalties along with the associated fuel charges. The term "gathering" is not a term contained in the parties' contract. And the parties do not agree on a technical definition of "gathering."

**{¶73}** Appellants contend "gathering" is the term used for collecting the gas from multiple wells and funneling it into an intermediary pipeline and that gathering is a "midstream service." They claim the lease only permits the deduction of costs for transportation of the gas occurring after gathering is complete. Appellants assert that gathering occurs between the wellhead and processing facility, whereas the only

permissible transportation cost deducted from their royalty payments happens *after* gathering and the processing of gas "to deliver the gas for sale."

**{¶74}** Additionally, Appellants argue the trial court conflated Appellee's right to transport and deliver the gas in the granting clause with the limited deductions permitted in the royalty clause. Although the granting clause authorizes Appellees the broad right to transport, they contend the lease does *not* indicate Appellees can reduce Appellants' royalty payments by the amount paid to transport *except* transporting the gas "for sale" or to the point of sale. Thus, Appellants claim the midstream production transportation costs cannot be deducted from Appellants' gas royalty under the plain language of the lease.

**{¶75}** Among other things, the granting clause grants Appellee the right to "transport by pipelines or otherwise across and through said lands oil, gas and their constituents from the subject and other lands . . ." Appellee argues that this right as spelled out in the granting clause shows what the contracting parties meant when they agreed Appellee could reduce the "transportation" costs. Upon reading the lease agreement as a whole, this is a reasonable conclusion and interpretation. However, it is not the only reasonable interpretation.

**{¶76}** In the alternative, Appellants contend that the clause is ambiguous, and as such, a genuine issue of fact remains for the factfinder. We agree.

**{¶77}** Appellants claim that the transportation of natural gas and the gathering of gas are distinct functions that do not overlap.

**{¶78}** They assert that the term "gathering" means "collecting the gas from multiple wells and funneling it into a small intermediary pipeline." (Ex. 3 to EAP's Summary Judgment Motion, part of Appellants' interrogatory responses. ) And as stated, they claim that "transportation" "involves the movement of gas through a pipeline's principal transmission system." *Northern Nat. Gas Co., Div. of Enron Corp. v. FERC*, 929 F.2d 1261, 1265 (8th Cir.1991).

**{¶79}** Appellee urges us to affirm and find the lease royalty provisions are unambiguous and that a plain reading permits it to reduce the royalty payments by transportation costs, including gathering and fuel costs, which Appellee argues are

encompassed by the word transportation.  They urge us to find that gathering constitutes transportation.

**{¶80}**  Appellee also claims the use of the term transport in the lease's granting clause demonstrates the parties' intent and the later use of the word "transportation" in the royalty section has the same meaning.

**{¶81}**  However, Jason Brunswell testified that "gathering" is the "transportation of wellhead gas from the pad . . . to the next point" (Brunswell Depo. p. 17.)  EAP expert David Vinson testified that gathering is "the transportation of gas via smaller diameter pipelines from the wellhead meters directly to central processing or delivery facilities"; or the transportation of gas from wellheads to metered central delivery points.  (Vinson Report Ex. 4 p. 6.)  Vinson further said that gathering is known as a transportation service in the oil and gas industry.  (EAP's MSJ, Ex. 4.)

**{¶82}**  Vinson also testified that Appellee reduced Appellants' royalties by costs for fuel that "midstream providers purchased and consumed in connection with gathering."  So if gathering is an allowable deduction, then so is the associated fuel.

**{¶83}**  A plain reading of the royalty provision and the lease agreement as a whole establish a genuine issue of fact remains as to what expenses Appellee was authorized to deduct from Appellants' royalty payments.

**{¶84}**  As Appellants argue, a plain reading of the phrase "to deliver the gas for sale" tends to invoke the end of the process and transportation of the gas to the end user or the purchaser.  Appellants claim this phrase limits the allowable deductions to those costs for transportation, compression, and/or dehydration *incurred to get the gas to the point of sale or to transport the product to a buyer*.

**{¶85}**  However, Appellee contends because compression and dehydration occur in an earlier phase of the gas production chain, these expenses would never reduce Appellants' royalty payments if the phrase "to deliver the gas for sale" was read narrowly to mean delivery to the point of sale.  The trial court agreed, relying on Vinson's expert report to explain the meaning of the terms "compression" and "dehydration" as occurring at the gas gathering stage.  (January 22, 2024 Judgment ¶ 42.)

**{¶86}**  As the trial court found, a broad reading of the phrase "to deliver the gas for sale" arguably encompasses the entire process, and consequently, could authorize

Appellee to deduct the midstream transportation expenses as Appellee contends. In light of the fact that there are two reasonable interpretations of the phrase, we find a genuine issue of fact remains.

**{¶87}** As the Ohio Supreme Court very recently held in another oil and gas lease interpretation case:

> [T]he parties' filings and arguments demonstrate that triable issues of fact remain. . . . To determine from all of th[e submitted] information the definitive legal meaning that the parties intended by the lease language would require this court to step into the role of fact-finder and weigh the credibility of the witnesses and draw inferences from the evidence.

*Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, ¶ 20.

**{¶88}** Here, the trial court went to great lengths to conclude the lease provisions are unambiguous. While it declared the provisions are not ambiguous, the court nevertheless relied on extrinsic evidence to support its decision in favor of Appellee and the determination that the term transportation in this case includes gathering, as well as fuel used midstream and not just to the point of sale. The trial court reached conclusions of fact. Thus, we find error.

> Even if the trial court merely considered "the available evidence" in an effort to understand a technical term, it appears that it nonetheless conducted fact-finding rather than simply determining, for purposes of summary judgment, whether a disputed fact existed. That is not a permissible action by a trial court at the summary-judgment stage. *See Dupler v. Mansfield Journal Co., Inc.*, 64 Ohio St.2d 116, 121, 413 N.E.2d 1187 (1980) (noting that a court considering summary judgment "may not weigh the proof or choose among reasonable inferences") . . .

*Tera, supra,* at ¶ 15.

## II. OIL ROYALTY ARGUMENTS

**{¶89}** The common lease language setting forth the oil royalty provisions in Subsection 4(A) states:

> 4. In consideration of the premises the Lessee covenants and agrees:

Case Nos. 24 CA 0974, 24 CA 0975

(A) To deliver to the credit of the Lessor in tanks or pipelines, as royalty, free of cost, the equal one-eighth (1/8) part of all oil produced and saved from the premises, _or_ at Lessee's option to pay Lessor the market price for such one-eighth (1/8) royalty oil at the published rate for oil of like grade and gravity prevailing on the date such oil is run into tanks or pipelines.

(Emphasis added.)

**{¶90}** The foregoing affords Appellee two options when paying oil royalties.

**{¶91}** Appellants argue the first option provides that Appellee can deliver a portion of the oil to Appellants as their payment. Because Appellee did not elect this option, they claim that any analysis of the first half is irrelevant since this option requires Appellee to give Appellants physical possession of one-eighth of the oil produced.

**{¶92}** Appellee disagrees. It contends the plain language of the first option permits the deduction of trucking costs associated with oil royalties. They claim that to "deliver to the credit of" the lessor or landowner "as royalty" means that Appellee was to give the lessor payment for one-eighth equivalent of the oil. Thus, it is unclear whether this first option requires delivery of the physical possession of oil to the Appellants.

**{¶93}** Appellee also claims the references to "in tanks or pipelines" and "produced and saved on the premises" in the first half of 4(A) allow it to deduct its processing and transportation costs paid to others, including trucking, but does not allow it to deduct its own costs of production. This reading is neither clear nor evident from the plain language of the agreement.

**{¶94}** Instead, the inclusion of the phrase "in tanks or pipelines, as royalty, free of cost" arguably means the contrary. The ordinary and plain meaning of the phrase "free of cost" does not permit Appellee to deduct its costs. Instead, this phrase means "not requiring payment." _See_ https://www.wordreference.com (accessed July 3, 2024.)

**{¶95}** Thus, the first half of Subsection 4(A) is ambiguous.

**{¶96}** Appellants claim the second half of Section 4(A) permits Appellee to pay them a certain percentage of the oil produced. Since Appellee opted to pay Appellants for their oil royalties as opposed to delivering actual oil, they claim the second half of Section 4(A) governs our analysis.

**{¶97}** Appellee's second oil royalty payment option allows it to pay Appellants "the market price for such one-eighth (1/8) royalty oil at the published rate for oil of like grade and gravity prevailing on the date such oil is run into tanks or pipelines."

**{¶98}** Appellants contend this section requires payment at the market price for the oil and does not allow Appellee to deduct its trucking expenses. We agree.

**{¶99}** We conclude that this option is not ambiguous. If Appellee elects this option, it dictates Appellants' payment be at market price and "at the published rate" for oil of that grade and gravity at the time the oil enters tanks or pipelines. The plain language of this option does not permit the deductions of any costs.

**{¶100}** Appellants claim the reference to the "published rate" dictates the point and price of valuation. Appellants assert that once the oil is in a tank or pipeline, Appellee is required to pay Appellants the "published rate" for that type of oil at that point in the value chain.

**{¶101}** "Market price" is defined as "the price at which a security is currently selling on the market." The definition does not indicate that market price permits the seller to deduct its costs or expenses. https://www.merriam-webster.com/dictionary (accessed July 5, 2024.) Based on the foregoing, the plain language of the second oil royalty clause is not ambiguous and does not reflect Appellee is permitted to deduct its costs or expenses.

**{¶102}** In light of the ambiguity in the first half of the clause, however, we find that Section 4(A) is ambiguous, and as such, summary judgment was not warranted on the parties' oil royalty arguments.

Conclusion

**{¶103}** Based on the foregoing, the trial court erred by weighing competing definitions of the words "transportation" and "gathering" when addressing summary judgment. The court also erred to the extent it considered custom and usage evidence or testimony in its analysis and by considering the testimony in an effort to understand technical terms. *Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945 (trial courts cannot weigh available evidence to understand a technical term.)

**{¶104}** We conclude the lease language is ambiguous. Thus, genuine issues of material fact exist regarding the meaning of the lease term transportation and whether it

encompasses gathering and fuel costs associated with or incurred during gathering. We also conclude that it is unclear based on a plain reading of the oil royalty provision whether Appellee was permitted to deduct its trucking expenses.

{¶105} We reverse the trial court's decision and remand for further proceedings.

Waite, J., concurs.

Dickey, J., concurs.

[Cite as *EAP Ohio, L.L.C. v. Sunnydale Farms, L.L.C.*, 2024-Ohio-4522.]

---

For the reasons stated in the Opinion rendered herein, it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Carroll County, Ohio, is reversed.  We hereby remand this matter to the trial court for further proceedings according to law and consistent with this Court's Opinion.  Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**